IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2015 Term
_____

No. 13-1128
_____

FILED
November 18, 2015
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LAWYER DISCIPLINARY BOARD,
Petitioner

v.

JARRELL L. CLIFTON, II,
Respondent

_____

Lawyer Disciplinary Proceeding
No. 12-05-448

LAW LICENSE ANNULLED

_____

Submitted: October 6, 2015
Filed: November 18, 2015

Jessica H. Donahue Rhodes, Esq.          Mark McMillian, Esq.
Office of Disciplinary Counsel            Erin K. Snyder, Esq.
Charleston, West Virginia                 Mark McMillian—Attorney at Law L.C.
Counsel for the Petitioner                Charleston, West Virginia
                                          Counsel for the Respondent

JUSTICE BENJAMIN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

2.      "A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syl. pt. 3, *Comm. on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

3.      "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syl. pt. 3, *Comm. on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).

4. "Ethical violations by a lawyer holding a public office are viewed as more egregious because of the betrayal of the public trust attached to the office." Syl. pt. 3, *Comm. on Legal Ethics v. Roark*, 181 W. Va. 260, 382 S.E.2d 313 (1989).

5. "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. pt. 4, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

6. "Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Syl. pt. 2, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

7. "Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim

rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses." Syl. pt. 3, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

Benjamin, Justice:

This lawyer disciplinary proceeding was instituted against Jarrell L. "J.L." Clifton, II by the Office of Disciplinary Counsel ("ODC"). Following an evidentiary hearing on November 10 and 11, 2014, the Hearing Panel Subcommittee ("HPS") of the Lawyer Disciplinary Board ("LDB") determined that Mr. Clifton engaged in unethical conduct, violating Rules 1.7(b), 8.1(a), 8.4(b), 8.4(c), and 8.4(d)[1] of the West Virginia Rules of Professional Conduct.[2] The HPS recommended that Mr. Clifton receive, among other sanctions, a two-year suspension of his law license.

The ODC disagrees with the HPS's recommended disposition, arguing that Mr. Clifton's law license should be annulled. Mr. Clifton also disagrees with the HPS's recommended disposition, asserting that while "disciplinary action in some form is appropriate, . . . [a]ppropriate sanctions would be a lesser variant of that recommended by the [HPS]."

---

[1] The text of these rules is provided in Part I.E., *infra*.

[2] Unless otherwise specified, references to "Rules" in this opinion are to the West Virginia Rules of Professional Conduct. Additionally, we note that the Court approved comprehensive amendments to the Rules, which became effective on January 1, 2015. Because the events giving rise to this disciplinary proceeding all occurred before January 1, 2015, we rely on the version of the Rules in effect at the time of those events.

After careful consideration, we conclude that Mr. Clifton's unethical behavior warrants the annulment of his law license.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Events giving rise to the disciplinary proceedings

Mr. Clifton lives and works in Marlinton, Pocahontas County, West Virginia. Before he started law school in 2004, Mr. Clifton operated a bar/restaurant, was a police officer, and worked for Child Protective Services, all in Marlinton. Upon successful completion of law school and the bar examination, Mr. Clifton was admitted to the bar on November 5, 2007. Directly following his admission, Mr. Clifton served as an assistant prosecuting attorney for Pocahontas County from November 7, 2007, to January 15, 2011. Mr. Clifton began working for the prosecutor's office part-time, ultimately shifting to full-time employment before leaving the office in 2011 for private practice.

In August 2012, a criminal investigation of a police officer in Marlinton led the State Police and the Federal Bureau of Investigation ("FBI") to investigate Mr. Clifton. Mr. Clifton was indicted on two counts of sexual assault in the second degree and two counts of imposition of sexual intercourse on an incarcerated person in the

Circuit Court of Pocahontas County.[3] He self-reported the indictment to the ODC. The ODC opened a complaint on August 8, 2012, and requested a response by letter dated August 9, 2012. In his response, Mr. Clifton invoked the Fifth Amendment until the criminal matters were resolved,[4] and he requested a stay of the disciplinary proceedings. The request to stay the proceedings was granted on September 15, 2012.

On January 8, 2013, the criminal charges against Mr. Clifton were dismissed with prejudice. Subsequently, on April 27, 2013, the stay on the disciplinary proceedings was lifted. The ODC obtained a copy of the files concerning the criminal investigation, and using that information, the ODC identified three women who, it determined, engaged in sexual conduct with Mr. Clifton in his office while he served as an assistant prosecuting attorney. The ODC contended that Mr. Clifton's sexual involvement with these women was unethical, and the Investigative Panel of the LDB detailed the alleged unethical conduct in a statement of charges dated November 5, 2013.

---

[3] The pertinent language of the indictment is quoted *infra*, Part I.B.

[4] Of the various protections afforded by the Fifth Amendment to the United States Constitution, Mr. Clifton appears to have attempted to assert his rights under the following language: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

A hearing on the matter was held on November 10 and 11, 2014, during which the HPS heard the testimony of several witnesses, including Mr. Clifton, and admitted other evidence. The evidence presented concerned the allegations of three women: T.S., K.M., and L.B.[5]

**B. Allegations involving T.S.**

In August 2009, T.S. was indicted in Pocahontas County on two counts of possession with intent to deliver a controlled substance. She pled guilty to one of the counts, and the second count was dismissed. By order entered March 19, 2010, T.S. was sentenced to one to five years of incarceration. Her sentence was suspended on the condition that she complete, among other things, two years of probation and that she take part in the Pocahontas County Day Report Center Program ("Day Report").

After T.S. began Day Report, Mr. Clifton sent her a message on Facebook, a social networking website, regarding a picture she had posted of herself. Mr. Clifton testified, "I told her I really liked this one photo of her backside toward a camera where she was wearing only panties and I said 'Yeah, I really like that one.' And she said 'Well, it looks a lot better now.' And I said, 'You'll have to show me.'" Both T.S. and Mr.

_____

[5] To protect the identity of the women who made allegations involving misconduct against Mr. Clifton and one of the witnesses, in light of the personal and potentially embarrassing nature of the facts of this case, we refer to these women by their initials.

4

Clifton stated that following the messages regarding the picture, the two began an ongoing correspondence. T.S. testified that she told Mr. Clifton that she was upset about having to take part in Day Report. She testified, "I didn't want to be on day report and he told me that he could maybe help me." According to T.S., in response to her displeasure with Day Report, Mr. Clifton told her "to stop by [his office at the courthouse] sometime."

Although she did not remember the exact dates and times of her visits to Mr. Clifton's office, T.S. testified during the hearing on November 10, 2014, that she visited his office three to four times in the summer of 2010 "[b]etween eight and four." She claimed that during these visits, Mr. Clifton asked to take nude photographs of her. She stated that he also asked her to perform oral sex on him. Disciplinary counsel questioned T.S. as follows as to the visits:

> Q     And what happened the next time you went to his office?
> A     I mean I didn't want to go to jail, so, you know, I went back and, you know, the third time, I think I started to give him oral sex.
>        . . . .
> Q     Okay. And you stated you didn't want to go to jail. What did you mean by that?
> A     Well, I was told -- just like you don't want to go to jail, you don't want to go back to jail and stuff like that, and I didn't because I wasn't doing anything wrong, so I did not want to go back to jail.
> Q     So when you were in his office, he was saying that to you?
> A     Yes, ma'am.

5

T.S. clarified this testimony on cross examination by Mr. Clifton's counsel:

> Q        . . . You said that you were afraid if you didn't comply with what Mr. Clifton wanted from you, that it could result in you being put back in jail, right?
>
> A        Yes. Well, I mean when you're directly threatened or you take it as a threat, I mean when somebody says to you "I don't want to see you go back to jail," or, you know, things like that, I mean, you know, I took that as a threat that I'd end up back in jail. In some portion or way, I'd end up in jail.
>
> Q        Okay. And the way you feared that might happen -- because, obviously, Mr. Clifton couldn't put you in jail, right?
>
> A        Well, I don't know. Anybody can pull anything and do anything. I don't know. I mean I was fearing, I mean.
>
> . . . .
>
> Somebody that's, you know, doing something, they're really not supposed to be doing, I mean they can go to lengths and do things. I don't know. This is what I'm thinking.
>
> . . . .
>
> I don't know what length he would go to put me back in jail. I was already in trouble. If I add anything else to it, it's going to be more time that I'd go back to jail.

T.S. testified that after her last visit to Mr. Clifton's assistant prosecuting attorney office—she estimated that she visited him in his office three to four times—she began to send explicit photographs and videos of herself to him at his request. She claimed that she received a picture of his penis. Mr. Clifton saved the pictures and videos that T.S. sent him on his personal computer. These photos and videos were ultimately introduced into evidence by disciplinary counsel during the hearing. Disciplinary counsel acquired the media from Mr. Clifton. Mr. Clifton admitted that at some point he told T.S. that he did not have the pictures or videos anymore, explaining, "I thought she was as

6

concerned as I was about them being out there. I never intended for anyone to ever know I had them."

A criminal investigation by the State Police and the FBI of Mr. Clifton's relationship with T.S. began in August 2011, following allegations by T.S. that her sexual relationship with Mr. Clifton, while he was an assistant prosecuting attorney, was not consensual. In April 2012, the investigators asked T.S. to arrange a meeting with Mr. Clifton at his law office—by this point, Mr. Clifton had begun working in private practice—and they asked T.S. to wear a wire[6] during the meeting. During the resulting meeting on April 19, 2012, Mr. Clifton repeatedly asked to take photos of T.S. and continually requested that T.S. touch his penis. Mr. Clifton later explained his reason for making the requests for sexual contact during the November 11, 2014, hearing before the HPS as follows:

> I didn't have the benefit of knowing what craziness she was selling to the police officers. My concern -- I felt that my liability out there were pictures and conversations. So I thought if she would do some sort of overt act, that I could feel safe that she would never disclose the fact that she had sent me pictures.

---

[6] The wire consisted of a non-transmitting recording device attached to a key chain.

Mr. Clifton was questioned by two investigators on May 29, 2012: Lieutenant Robert Simon of the West Virginia State Police and Special Agent Frederick Aldridge of the FBI. Lt. Simon testified that when he first approached Mr. Clifton, Mr. Clifton described T.S. as a professional acquaintance and claimed that he and T.S. were not friends. Lt. Simon further testified that Mr. Clifton denied knowledge of T.S.'s criminal background. Later, according to Lt. Simon, after questioning him about whether he had a sexual relationship with T.S., Mr. Clifton admitted that he and T.S. were "friends on Facebook" and that he had exchanged nude photographs with T.S. Special Agent Aldridge's testimony on the matter was substantively similar.

As a result of the allegations T.S. made to investigators, Mr. Clifton was indicted on two counts of sexual assault in the second degree and two counts of imposition of sexual intercourse on an incarcerated person in the Circuit Court of Pocahontas County. Specifically, the indictment alleged that Mr. Clifton

> committed the offense of "sexual assault in the second degree"[7] in that he did unlawfully and feloniously engage in sexual intercourse with [T.S.], by having her place her mouth on his penis, without her consent, and the lack of consent was the result of forcible compulsion, [T.S.] being threatened with incarceration, against the dignity of the State

on two separate occasions. (Footnote added). The indictment also alleged that Mr. Clifton

_____

[7] The crime of sexual assault in the second degree is described in W. Va. Code § 61-8B-4(a)(1) (1991).

8

committed the offense of "imposition of sexual intercourse on an incarcerated person"[8] in that JARRELL LEE CLIFTON, II, being a person employed by and/or acting pursuant to the authority of the Pocahontas County Commission as an Assistant Prosecuting Attorney, did unlawfully, and feloniously engage in sexual intercourse with [T.S.], by having her place her mouth on his penis, while [T.S.] was incarcerated, against the peace and dignity of the State

on two separate occasions. (Footnote added). The indictment was eventually dismissed with prejudice on the State's motion. According to Lt. Simon, the investigators determined that the sexual encounters between Clifton and T.S. were, contrary to T.S.'s initial assertions, consensual.

The conclusion by investigators that T.S. and Mr. Clifton engaged in consensual sex acts was supported by a statement given to the investigators by M.F., a friend of T.S. M.F. and T.S. took part in Day Report together during the time T.S. alleges she had sexual contact with Mr. Clifton. According to M.F., T.S. claimed to have had sex with Mr. Clifton in his courthouse office. M.F. testified during the hearing on November 11, 2014, that while she did not believe that Mr. Clifton had raped T.S., she did believe that Mr. Clifton had consensual sexual contact with T.S.

---

[8] The crime of imposition of sexual intercourse on an incarcerated person is detailed in W. Va. Code § 61-8B-10 (2012). In the ODC's Statement of Charges, the ODC asserted that Mr. Clifton's sexual relationship with T.S. constituted a violation of W. Va. Code § 61-8B-10 and a violation of the West Virginia Rules of Professional Conduct; however, Mr. Clifton and the ODC later agreed that the charge regarding W. Va. Code § 61-8B-10 be withdrawn, and it was not offered to the HPS for consideration.

By letter dated May 30, 2014, addressed to the ODC, Mr. Clifton claimed that "[a]ll of the 4 indictments were based on false accusations." Before the HPS, Mr. Clifton denied ever sending a sexually explicit photo of himself to T.S., but he admitted to having received sexually explicit photos from her and to having engaged in "sexual banter" with her on Facebook. He denied that he engaged in sexual banter with T.S. in his courthouse office. He admitted that he looked at the photos and videos of T.S. on his personal computer in his office while he worked as an assistant prosecuting attorney. He testified that T.S. visited him in his office at the courthouse and that she exposed herself to him, but he alleged that the majority of her visits consisted of discussion of her community service projects. Mr. Clifton maintains that he never had any physical sexual contact with T.S.

**C. Allegations involving K.M.**

In the mid 1990's, K.M. worked in a bar owned by Mr. Clifton. K.M. testified that she had a sexual relationship with Clifton at that time, which included having sex at the bar. This sexual relationship occurred while Mr. Clifton was dating K.M.'s niece. K.M. testified during the hearing on November 10, 2014, that Mr. Clifton recorded a sexual encounter at the bar without her knowledge using the bar's video security system. About two years later, K.M. claimed she discovered he had the recording. She testified, "I asked him to please give it to me, get rid of it, please, let's tear

it up, get rid of it." Prior to attending law school, Mr. Clifton told K.M. that he had destroyed the recording.

K.M. claimed that after Mr. Clifton assured her that he had destroyed the recording, the two had "called a truce." She rented a house from him while he attended law school. After graduating from law school, Mr. Clifton represented K.M. in a civil suit while he worked part-time as an assistant prosecuting attorney. Mr. Clifton's relationship with K.M.'s niece was long over by this point.

In late March 2009, a criminal complaint was issued against K.M.'s son for brandishing. About a week later, K.M. had a chance encounter with Mr. Clifton in the grocery store and asked for advice concerning her son's criminal charge. Both K.M. and Mr. Clifton testified that he invited her to his office at the courthouse to discuss the case.

K.M. testified that soon after speaking with him at the grocery store, she went to see Mr. Clifton at his office. She alleged that directly upon arriving, he told her, "Oh, you caught me looking at porn." She said that she told him, "I didn't come here for that[;] I don't have time for that," and that they "not really laughed it off, but kind of just got through it." She asserted that they then talked about her son's case. According to K.M., Mr. Clifford reviewed information on his computer and told her that the stories of the two alleged victims in her son's case did not match.

11

K.M. testified that the conversation then became sexual in nature:

> [Mr. Clifton] said "Well, since you're here, there's something I've been wanting to talk to you about," and he brought up that video that he had sworn to me was destroyed. . . . I asked him "Please, don't do this to me. You swore to me it was gone. You swore to me it was gone." And he said "Well, we can get rid of it today under two conditions," and he said "Those times that we did have sex, I never saw your body." He said, "Let me see your body." And I said, "No, I'm not doing that. Please don't do this to me." He said, "Well, you didn't ask what the second condition was." And I said, "I don't want to know what the second condition is because I'm not doing anything." And he stood up from behind his desk and I don't know if he was already -- he had already exposed himself or he exposed himself right then. I'm not sure he was telling me to come here.
> . . . .
> And he said "Come" -- he didn't walk to me where I was sitting in the chair. And I was standing up, ready to go and he just kept telling me to "Come here, come here, just come here and touch it, come here and just do this, just touch it." I mean I was scared to death.

When asked by disciplinary counsel why she was scared, K.M. testified:

> He had a look that I've never seen in my life on his face, and then I had just sat there and poured my heart out about my son, scared my son was going to go to prison and now he's the assistant prosecuting attorney. I didn't know if he was going to -- I mean if I didn't do that if he was going to send my son to prison. I didn't know what to expect. I didn't expect any of that when I walked in that office.

K.M. testified that because she was terrified for her son, she proceeded to hold and kiss

Mr. Clifton's penis, but she stated that she did not give him oral sex. She said that when

she finally went to leave the office, he told her, "Hey, if anybody asks you what you were

12

doing in here, tell them it was about the [civil] case." She claimed she asked him again about her son's case, and she testified to the following:

> He [Mr. Clifton] told me he could recuse himself. And I thought -- I mean I didn't know -- I went to classes for criminal justice and stuff and I know that means you can take yourself off of a case or be removed from a case, but with what had just happened to me, I didn't know if that was a good thing or a bad thing. I didn't know if that meant I'll take myself off and he'll go to prison or -- I didn't know what that meant. I mean I wasn't expecting any of this.

Mr. Clifton was ultimately involved in K.M.'s son's case; it was dismissed in 2009 upon a motion filed by Mr. Clifton on behalf of the State.

Mr. Clifton testified that K.M.'s description of the meeting he had with K.M. in his courthouse office was largely fabricated. He denied watching porn when K.M. arrived at his office; however, in his Answer and Affirmative Defenses that he submitted to the ODC, Mr. Clifton "concede[d] that comments of an inappropriate nature may have been exchanged during any conversation with [K.M.], as was the nature of [his] and [K.M.]'s long standing relationship." Mr. Clifton also denied exposing his penis to her, and he denied that K.M. kissed his penis. When asked by disciplinary counsel if he thought it was appropriate for him to handle K.M.'s son's case, Mr. Clifton answered in the affirmative.

13

At the hearing before the HPS, Mr. Clifton admitted, contrary to what he had told K.M. and contrary to his assertion in his Answer and Affirmative Defenses,[9] that the recording of his sexual encounter with K.M. had not been destroyed. He possessed the recording and brought it to the hearing before the HPS. When questioned about whether he had lied to K.M. about destroying the tape, he said, "In my mind it was gone." He claimed that he had placed the tape in bags with his business records for the bar he had closed and stored the bags in his parents' house.

### D. Allegations involving L.B.[10]

Like K.M., L.B. also had a sexual relationship with Mr. Clifton before he attended law school. The relationships were not contemporaneous; Mr. Clifton testified that he and L.B. had a sexual encounter in late summer of 1995.

In the November 10, 2014, hearing before the HPS, L.B. testified that in 2009, she was the victim of a theft and that she had asked Mr. Clifton what she could do about it. She said that she then visited him in his assistant prosecuting attorney's office and that they discussed the case. She testified, "He told me -- I'm not sure if he called the

---

[9] Mr. Clifton's Answer and Affirmative Defenses states, "[K.M.] wanted a copy of the videotape; however, Respondent no longer possessed the videotape."

[10] After the events giving rise to her allegations, but before the hearing on November 10 and 11, 2014, L.B.'s initials changed to L.C.

police or if he told me to call the police and if there was any witnesses, to have them write a statement. Pretty much that's what we did, that's what I did."

According to L.B., the conversation then turned to sex: "He mentioned that he remembered me from Huckleberry's [a bar Mr. Clifton had previously operated] and said I never finished what I started. And I kind of blushed and was, like, 'You know, what are you talking about'? And he mentioned I never performed oral sex on him, and then it pursued from there." L.B. testified that she then performed oral sex on Mr. Clifton.

Around the same time as the theft, but prior to performing oral sex on Mr. Clifton, L.B. was the victim of domestic violence. Charges were brought against her then-boyfriend. A domestic violence protective order ("DVPO") was entered against L.B.'s boyfriend. L.B. alleged that she wanted to have the order dropped. She testified:

> I went to Janet Kershner, the magistrate at the time and asked her if she could drop it to where we could see each other legally and she said she didn't have a problem with that, she knows how that stuff goes, but she told me it was up to Mr. Clifton. And I went and asked J.L. about it and he said he didn't want to drop it. And he said "Do you really want to put yourself in that relationship, you know?" "Are you sure you want to do that?" And I said "Yeah." Then I went back to Janet Kershner, and I said "He don't want to do it." She's like, "Well, I don't really" -- she said she didn't have a problem with it, but Mr. Clifton did. He didn't want to drop it.

L.B. testified that when she went to see Clifton about the DVPO, he "mentioned something about seeing my breasts."

15

A charge of destruction of property was brought against L.B. in May 2009 for breaking her boyfriend's windshield. She entered into a diversion agreement in the case, and Mr. Clifton signed off on that agreement. The case against L.B. was ultimately dismissed; Mr. Clifton signed off on the dismissal order.

At the hearing before the HPS, L.B. was questioned as follows by disciplinary counsel with regard to her perception of her relationship with Mr. Clifton:

> Q      Okay. And did you believe that you could benefit from a sexual relationship with Mr. Clifton?
> A      See, that's hard to answer because I wasn't in no serious trouble, you know, so that wasn't going through my mind, you know, that I could benefit from that. However, if I would have got into serious trouble, then I probably would've went to him and asked him, you know, to help me, believing that he would, but I wasn't in serious trouble, so I really didn't think about that at that time.

L.B. told the HPS that she engaged in oral sex with Mr. Clifton in his courthouse office one or two more times after her initial visit. She said that she recalled one time that she was caught leaving Mr. Clifton's office after having performed oral sex:

> I was performing oral sex on him and the door was locked. Someone tried to enter. And I believed he said "Hold on" or maybe they just knocked, whatever, and he said "Hold On," and it ended up being Davina Agee. I was going out while she was coming in.

16

Mr. Clifton testified that he recalled a time that Davina Agee had knocked on his office door when L.B. was there, but he asserted that he was not receiving oral sex at that time. Mr. Clifton denied having any sexual contact with L.B. in his office at the courthouse.

**E. HPS's findings and conclusions**

Following the November 10 and 11, 2014, hearing, the HPS completed its June 23, 2015, report to this Court. First, with regard to T.S., the HPS found that T.S. performed oral sex on Mr. Clifton in his assistant prosecuting attorney's office and that she provided him with sexually explicit photos and videos he solicited while she was on probation and participating in day report. The HPS concluded that Mr. Clifton's behavior violated Rules 1.7(b), 8.4(c), and 8.4(d), which provide as follows:

> **RULE 1.7    Conflict of Interest: General Rule**
> . . . .
> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person or by the lawyer's own interests, unless:
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
> (2) the client consents after consultation. . . .
>
> **RULE 8.4    Misconduct**
> It is professional misconduct for a lawyer to:
> . . . .
> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
> (d) engage in conduct that is prejudicial to the administration of justice . . . .

17

Also with regard to Mr. Clifton's relationship with T.S., the HPS found that Mr. Clifton provided false information to the ODC when he denied the conduct alleged in the indictment. The HPS determined that this conduct violated Rule 8.1(a), which provides:

> **RULE 8.1 Bar Admission and Disciplinary Matters**
> An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
> (a) Knowingly make a false statement of material fact .
> . . .

Furthermore, the HPS found that Mr. Clifton provided false information to investigators about his relationship with T.S. in violation of 18 U.S.C. § 1001(a) (2006)[11] and W. Va. Code § 15-2-16 (1977).[12] The HPS concluded that this behavior constituted a violation of Rule 8.4(b), which provides:

---

[11] 18 U.S.C. § 1001(a) provides that

> whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation . . .

shall be subject to fine or imprisonment.

[12] W. Va. Code § 15-2-16 provides that it is a misdemeanor to "knowingly give[] false or misleading information to a member of the [West Virginia State Police]").

18

**RULE 8.4    Misconduct**
It is professional misconduct for a lawyer to:
. . . .
(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects . . . .

Second, the HPS found that Mr. Clifton attempted to require K.M. to perform oral sex on him when she went to his office at the prosecutor's office about her son's criminal case. The HPS determined that this behavior constituted violations of Rules 1.7(b) and 8.4(d), quoted *supra*. The HPS also found that Mr. Clifton "knowingly provided false information in his Answer and Affirmative Defenses when he represented that he no longer possessed the videotaped sexual encounter between him and witness K.M." The HPS concluded that this conduct violated Rule 8.4(b), quoted *supra*.

Third, the HPS found that L.B. performed oral sex on Mr. Clifton in his assistant prosecuting attorney's office after she approached him with an inquiry about a criminal matter while she was both a defendant and a victim. The HPS determined that this behavior constituted violations of Rules 1.7(b) and 8.4(d), quoted *supra*.

### F. Recommended Sanctions

In deciding on a sanction, the HPS weighed the factors presented in Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure. According to that rule,

19

> [i]n imposing a sanction after a finding of lawyer misconduct, . . . the Court or [LDB] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.

*Accord* syl. pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998). The HPS determined that Mr. Clifton violated duties to his client, to the public, to the legal system, and to the legal profession, stating that "[a]s an Assistant Prosecuting Attorney for Pocahontas County, West Virginia, [Mr. Clifton] had a duty to his client, the State of West Virginia, to not engage in misconduct that constitutes a conflict of interest." The HPS continued:

> The witnesses described multiple incidents of sexual misconduct by [Mr. Clifton] which were in direct conflict with his responsibilities as an assistant prosecuting attorney representing the State of West Virginia. [Mr. Clifton] used the legal system and his position as a means by which he could have sexual contact with his victims.

The HPS also noted that Mr. Clifton engaged in dishonesty and fraudulent misconduct that interfered with the administration of justice.

The HPS further concluded that Mr. Clifton acted intentionally and knowingly, determining that he admitted to some of the allegations against him and that he "intentionally used his position as assistant prosecuting attorney to obtain sexual favors from women who were connected in some manner to the criminal justice system."

20

The HPS determined that the amount of real injury is great because it is likely that "none of the women who testified will be trusting of lawyers or the legal system in the future," and because Mr. Clifton's behavior "caused significant damage to the reputation and integrity of the office of prosecuting attorney . . . [and] the legal profession."

With regard to aggravating factors, the HPS concluded that "[t]he multiple aggravating factors present in this case were [Mr. Clifton]'s selfish motive, pattern of misconduct, multiple offenses, vulnerability of the victims, and illegal conduct." The HPS determined that there were two mitigating factors: an absence of a prior disciplinary record and Mr. Clifton's relative inexperience in the practice of law. The HPS did note that

> [w]hile [Mr. Clifton], during his testimony, may have raised an issue in mitigation by admitting that he was dealing with an inappropriate desire for pornography and other sexual issues during the time frame of these complaints, he did not present any medical testimony or evidence that he sought treatment for the same.

Thus, the HPS determined that the evidence of Mr. Clifton's inappropriate desire for pornography was not sufficient evidence to mitigate a sanction against him.

Upon examining the factors set forth in Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure, the HPS concluded that sanctions were appropriate and recommended that the Court impose the following sanctions:

21

A. That [Mr. Clifton]'s law license be suspended for a period of two years;

B. That [Mr. Clifton] be required to petition for reinstatement pursuant to Rule 3.32 of the Rules of Lawyer Disciplinary Procedure;

C. That, upon reinstatement, [Mr. Clifton]'s practice be supervised for a period of two (2) years by an attorney agreed upon between the [ODC] and [Mr. Clifton];

D. That at the conclusion of the two year suspension, prior to petitioning for reinstatement pursuant to Rule 3.32 of the Rules of Disciplinary Procedure, [Mr. Clifton] shall be required to undergo an independent psychological/psychiatric evaluation to determine whether he is fit to engage in the practice of law and is further required to comply with any stated treatment protocol;

E. That [Mr. Clifton] be ordered to undergo an additional 12 hours of continuing legal education with a focus on legal ethics; and,

F. That [Mr. Clifton] be ordered to reimburse the [LDB] the costs of these proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

The HPS explained:

By recommending suspension versus annulment, the Hearing Panel is in no way signaling that [Mr. Clifton]'s conduct was anything less than very serious. The Panel weighed the fact that two of the victims, K.M. and L.[B]., had prior consensual relationships with [Mr. Clifton]. . . . To some extent there was conflicting evidence as to whether all three victims engaged in a consensual relationship during the relevant disciplinary time period. Ultimately, however, the Hearing Panel concludes, that even if the sexual acts in question were not forcible so as to constitute a crime, there is clear and convincing evidence they were improper under the Rules of Professional Conduct. All three victims testified that [Mr. Clifton]'s position as an assistant prosecutor influenced their decision-making. Even if that had not been the case a lawyer, especially one who holds a public office, should not cross the line that was breached in this case. At some point

22

during the relevant times in dispute all three women were either victims, defendants, clients or on probation in matters over which [Mr. Clifton] had some degree of control, by virtue of his position as assistant prosecuting attorney.

## II.  STANDARD OF REVIEW

The LDB is responsible for investigating complaints alleging violations of the West Virginia Rules of Professional Conduct. W. Va. Rules of Lawyer Disciplinary Procedure 1. The HPS of the LDB "conduct[s] hearings and make[s] findings of fact, conclusions of law, and recommendations of lawyer discipline to the Supreme Court of Appeals on formal charges." W. Va. Rules of Lawyer Disciplinary Procedure 3. "In order to recommend the imposition of discipline of any lawyer, the allegations of the formal charge must be proved by clear and convincing evidence." W. Va. Rules of Lawyer Disciplinary Procedure 3.7; *see also* syl. pt. 1, *Comm. on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984) ("'In an attorney disciplinary proceeding based on a complaint charging professional misconduct and prosecuted by the [Board] for publicly reprimanding the attorney and for suspending the license of the attorney to practice law, the burden is on the [Board] to prove the charges contained in the complaint by full, clear and preponderating evidence.' Syl.Pt. 2 of *Committee on Legal Ethics v. Daniel,* 160 W.Va. 388, 235 S.E.2d 369 (1977).").

Although the LDB may make recommendations based on its investigations, "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate

23

decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Blair*, 174 W. Va. 494, 327 S.E.2d 671. This Court's standard of review, as set forth in syllabus point 3 of *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994), provides:

> A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

## III. ANALYSIS

Both the ODC and Mr. Clifton object to the HPS's recommendation. While the ODC finds no error with the HPS's findings of fact and the HPS's conclusions regarding violation of the Rules, the ODC believes the HPS's recommended sanction "is insufficient as applied to these facts and is inconsistent with relevant law." Mr. Clifton, argues that the evidence was unreliable, not probative, and unsubstantial and that it therefore fails to establish that he violated Rules 1.7(b), 8.1(a), and 8.4(d). He contends that "[a]ppropriate sanctions would be a lesser variant of that [sic] recommended by the [HPS]." Mr. Clifton also contends, as a threshold matter, that many of the charges were pursued out of time under Rule 2.14 of the West Virginia Rules of Lawyer Disciplinary Procedure.

24

## A. Timeliness

Mr. Clifton claims that some of the allegations set forth in the ODC's Statement of Charges refer to conduct that occurred more than two years prior to any complaint filed with the ODC and that therefore the ODC should have been barred from pursuing sanctions on those charges pursuant to Rule 2.14 of the West Virginia Rules of Lawyer Disciplinary Procedure. Rule 2.14 of the West Virginia Rules of Lawyer Disciplinary Procedure provides:

> **RULE 2.14   Limitation of Complaints**
> Any complaint filed more than two years after the complainant knew, or in the exercise of reasonable diligence should have known, of the existence of a violation of the Rules of Professional Conduct, shall be dismissed by the Investigative Panel.

The ODC argues that there was no delay in its investigation and charging of Mr. Clifton and that its pursuit of the charges against him did not fall outside of the limitation period set forth in Rule 2.14 of the West Virginia Rules of Lawyer Disciplinary Procedure.

The earliest events giving rise to the allegations of misconduct took place in early 2009. Mr. Clifton self-reported his indictment to the ODC in August 2012. The ODC informed Mr. Clifton by letter dated August 9, 2012, that a complaint had been opened. Mr. Clifton has not explained how, in the exercise of reasonable diligence, the ODC would have been aware of his conduct prior to him self-reporting it. While much of the alleged misconduct took place in 2009, more than two years from the date of the

25

complaint, the complainant[13]—the ODC—timely opened that complaint upon becoming aware of the existence of a violation of the Rules. Therefore, we determine that there is no merit to Mr. Clifton's argument that the charges against him should have been dismissed as falling outside of the limitation period set forth in Rule 2.14 of the West Virginia Rules of Lawyer Disciplinary Procedure.

## B. Findings of fact

The ODC and Mr. Clifton disagree as to whether the evidence presented to the HPS supports the HPS's findings of fact. While the ODC asserts that the HPS's findings were correct, Mr. Clifton argues that the findings were not supported by the evidence.

As we recognized above, we give substantial deference to the HPS's findings of fact. Syl. pt. 3, *McCorkle*, 192 W. Va. 286, 452 S.E.2d 377. This is because "the [HPS] is in a better position than this Court to resolve the factual disputes which may arise in a case. The [HPS] hears the testimony of the witnesses firsthand and, being

---

[13] In his brief, Mr. Clifton argues that "Rule 2.14 certainly cannot be avoided simply by positioning ODC itself as the Complainant." Upon examining Mr. Clifton's brief, it appears that he believes T.S., K.M. and L.B. are the complainants, not the ODC. To the extent that Mr. Clifton appears to assert that the ODC is not the complainant, we find no merit to this position; the record unambiguously shows that it was the ODC who filed the complaint against him. *See* W. Va. Rules of Lawyer Disciplinary Procedure 2.3 (indicating that the ODC may initiate complaints).

much closer to the pulse of the hearing, is much better situated to resolve such issues as credibility." *Id.* at 290, 452 S.E.2d at 381. When an attorney challenges the factual findings of the HPS, "[t]he burden is on the attorney at law to show that the factual findings are not supported by reliable, probative, and substantial evidence on the whole adjudicatory record made before the [HPS]." *Id.*

Starting with the testimony of T.S., Mr. Clifton contends that "[t]o find her version of events truthful would require brushing aside all the hearing evidence other than her own, which is itself self-contradicting." Mr. Clifton argues that T.S.'s reliability is questionable because she could not "remember the number of times she met with [Mr. Clifton] and what happened during those meetings," because of inconsistencies in her statements regarding allegations she made against other individuals, and because of the testimony of four witnesses who testified that T.S. had been untruthful in the past.

We cannot dispute that testimony given at the hearing indicates that T.S. has had difficulty with complete honesty in the past. This is true of allegations she has made against others and allegations against Mr. Clifton. Both Lt. Simon and M.F. testified that T.S. was untruthful when she claimed that Mr. Clifton had engaged in sexual relations with her against her will. However, despite her prior inconsistent statements, there is evidence that lends strong support to the HPS's factual findings.

27

First, both Lt. Simon and M.F. testified that they believed T.S.'s claims that she had a sexual relationship with Mr. Clifton while he was an assistant prosecuting attorney and while she was on probation and participating in Day Report. Second, T.S.'s description of the events she alleges occurred in Mr. Clifton's assistant prosecuting attorney's office is similar to the description of events given by K.M. and L.B. Third, the transcript of the recording produced from the meeting of T.S. and Mr. Clifton in his law office on April 19, 2012, shows a sexual familiarity and ease with T.S.; he asked her to hold his penis and expressed willingness to expose his penis to her. Fourth, Mr. Clifton has not attempted to explain a motive for T.S. to fabricate claims that she had sexual contact with him. Finally, the HPS, having observed T.S.'s demeanor as she testified to having engaged in oral sex with Mr. Clifton in his courthouse office, determined that T.S.'s allegations were credible.

We conclude that, with regard to the HPS's factual finding that T.S. engaged in oral sex with Mr. Clifton in his courthouse office, Mr. Clifton has failed to show that the finding is not supported by reliable, probative, and substantial evidence on the record.

Mr. Clifton also challenges the reliability of K.M.'s testimony, citing to portions of the record indicating that because of her former studies in criminal corrections and her knowledge that her son was charged with a misdemeanor, she could not have

28

rationally feared for her son to a degree that would compel her to engage in sexual relations with Mr. Clifton. He also contends that "[s]he cannot sensibly explain that she twice asked for legal assistance in civil matters . . . during these times." Regardless as to whether we agree with Mr. Clifton's points on K.M.'s mindset, without more, his points implicate the reasonableness of K.M., not her credibility and the HPS's judgment thereof.

Mr. Clifton also suggests that K.M. had "clear motives . . . to conceal the consensual nature of their relationship." It is unclear whether this assertion refers to his relationship with K.M. before his time at the prosecutor's office or after he began working at the prosecutor's office. To the extent that Mr. Clifton may imply that K.M. was motivated to conceal the consensual nature of their 1990's sexual relationship because she wanted to avoid "admitting she betrayed her niece," Mr. Clifton has not explained how her desire to protect her niece, who had ceased dating Mr. Clifton prior to his taking a position with the prosecutor's office, would motivate her to conceal the nature of the encounter K.M. claims occurred in his courthouse office. Thus, having failed to point to any evidence establishing K.M.'s testimony was not credible, we determine that Mr. Clifton has not shown that the HPS's findings of fact based on K.M.'s testimony were unsupported by the record.

We also recognize that Mr. Clifton argues that "there is not clear and convincing evidence to support the allegation that [he] misused the legal system and his

29

position to initiate the sexual relationship with K.M." We are perplexed by this assertion. Despite his testimony that he did not have sexual contact with K.M. when she visited his courthouse office to discuss her son, Mr. Clifton appears to concede that he *did* have a sexual encounter with K.M. but that the sexual contact was not accomplished by misuse of the legal system.

With regard to L.B., Mr. Clifton disputes the HPS's finding that he "used his position to extract sexual conduct from [L.B.] or that sexual acts occurred in his office." With regard to the first part of his argument—that he used his position to extract sexual conduct—we find that the evidence supports the HPS's finding that L.B. "went to him because he was the assistant prosecuting attorney and because [she was] seeking help." Were it not for his position as assistant prosecuting attorney, he would not have been able to engage in sex acts with L.B. We find it particularly probative that all of the sexual encounters described by L.B.—other than the encounter that occurred almost fifteen years earlier—occurred in Mr. Clifton's office, which we find indicates that the encounters were inextricably tied to his position as assistant prosecuting attorney.

As to the second part of his argument—that L.B. lied to the HPS about having sexual contact with him in his courthouse office—he has cited to no admissible

30

evidence impugning her credibility,[14] nor has he explained how L.B. might benefit from making false allegations as to sexual encounters with him. We determine that he has failed to show that the HPS's findings are unsupported by the evidence.

Mr. Clifton also challenges the HPS's finding that he was dishonest to investigators concerning his relationship with T.S. He claims that the evidence presented does not support this conclusion. He contends that while "Lt. Simon initially testified that he believed Mr. Clifton admitted more than a professional relationship with her only after he was told she had been wired," Lt. Simon's notes did not speak to this. We do not find this limited portion of Lt. Simon's testimony dispositive on the issue of whether Mr. Clifton was misleading or dishonest. Prior to the testimony given during the November 10, 2014, hearing, upon which Mr. Clifton relies, Lt. Simon was questioned by disciplinary counsel about his May 29, 2012, meeting with Mr. Clifton as follows:

> Q      Did [Mr. Clifton] ever say anything about [T.S.] stopping by his office?
> A      Yes. She would stop by the courthouse at his office to meet with him. Sometimes they would meet down at the Snowshoe Foundation, which was there in downtown Marlinton and they was working on the items with the

---

[14] Mr. Clifton asks that the Court consider the proffered testimony of a witness who regarded L.B. as untruthful. The witness's testimony was not permitted to be admitted into evidence because the witness's name was not provided on any witness list as is required by Rule 3.4 of the West Virginia Rules of Lawyer Disciplinary Procedure. The HPS decided that the witness's testimony, for which the ODC was unable to prepare, constituted an unfair surprise for the ODC. We agree with the HPS, and like the HPS, decline to consider that testimony.

Prevention Coalition and about getting the bowling alley started in Marlinton.

At one point in this, he explained -- described the relationship as a professional acquaintance and stated that they were not even friends. At one point in this interview, he stated that he wasn't even aware of her criminal background, which we had known that he had been -- signed off on some of her court proceedings as the assistant prosecutor. Obviously, it caused some alarm on our part when we believed that he was being deceptive during the interview.

Q    Did he ever answer a question regarding whether he had a sexual relationship with [T.S.]?

A    Yeah. . . . At this point in time, we went back and started asking about the contradictions with his stories. As he described, he was just a professional acquaintance of [T.S.], and then we confronted him with the numerous Facebook chats as well, and then Mr. Clifton admitted that he had a problem and exchanging photos and videos with [T.S.]

. . . .

Q    I think earlier there [referring to Lt. Simon's notes], it states "Clifton stated he did not have a sexual relationship with her and that they were friends."

A    Yes, ma'am.

This testimony establishes that Mr. Clifton did not advise the investigators of the true nature of his relationship with T.S. until after he was questioned as to whether he had a sexual relationship with her. Further, it establishes that he denied having a sexual relationship with her.

Additionally, Mr. Clifton argues that the testimony of Special Agent Aldridge established that Mr. Clifton did not mislead the investigators as to the nature of his relationship with T.S. In so arguing, Mr. Clifton relies on the following testimony:

Q [Mr. Clifton's counsel]  Now, you said that when you first -- or not first, but prior to the time you disclosed to

Mr. Clifton that you had sent [T.S.] wired up, that he did tell you they were friends on Facebook?

A [Special Agent Aldridge]    He did. He changed his story from being professional acquaintances to they were friends on Facebook and that they'd exchanged pictures.

Q    Okay. But that was before you told him that you sent him [sic] in wired?

A    Let's see how it's worded. Yes, that is.

Q    Okay. So he didn't deny that they had friendly contact or even exchanged pictures?

A    No.

Mr. Clifton contends that this testimony shows that he volunteered the information regarding the true nature of his relationship with T.S. prior to being told he had been recorded. Regardless as to whether this is true, the totality of Special Agent Aldridge's testimony reflects that Mr. Clifton misled the investigators.

During the hearing on November 10, 2014, disciplinary counsel questioned Special Agent Aldridge as follows:

Q    Okay. And do you recall what Mr. Clifton indicated about -- at first what his relationship with [T.S.] was?

A    Sure. It started out just that they were professional acquaintances was the words that they used or something to that effect . . . . He was working with the Prevention Coalition, so he would come in contact with her through that and he would give her advice about her project of she was -- she wanted to build a bowling alley in town, so the kids would have something to do other than drugs. So that's basically the extent of what he said was their relationship.

Q    What about if they were friends, did he ever indicate that?

33

A    Again, I don't think he ever said they were friends. It was a matter of they were professional acquaintances.

Q    Did you ever ask him about having a sexual relationship with [T.S.]?

A    We did and --

Q    And what was his response?

A    He basically denied any type of sexual relationship with [T.S.] Then at that point, he said that, you know, they were just friends on Facebook and we confronted him about the sexually explicit chat on Facebook and that's when [he] admitted that he had exchanged photographs, nude photographs with [T.S.]

Special Agent Aldridge's testimony, which is substantively similar to the testimony of Lt. Simon, establishes that Mr. Clifton, at the outset of the meeting, indicated that he and T.S. were only professional acquaintances. Mr. Clifton did not reveal the true nature of his relationship with T.S. until after the investigators began questioning him about having a sexual relationship with her. Thus, we agree with the HPS's determination that Mr. Clifton initially misled the investigators as to the nature of his relationship with T.S. Further, having determined that Mr. Clifton did in fact have a sexual relationship with T.S., the HPS could reasonably conclude that his statement to the investigators that he did not have a sexual relationship with her was untrue. Finally, we note that the HPS had the opportunity to judge the investigators' credibility by examining their demeanor when they testified. Thus, Mr. Clifton has failed to rebut the HPS's findings with regard to the testimony of the investigators.

34

Lastly, Mr. Clifton asserts that the HPS's finding that he was dishonest with respect to his retention of the recording of a sexual encounter with K.M. is unsupported by the evidence. We disagree and find the following testimony given by Mr. Clifton enlightening:

> When I closed down Huckleberry's Restaurant and Lounge, I had to keep all the records, bags and bankers boxes and all that stuff for a period of seven years. Whenever I put all that stuff together, it went into my mother's basement underneath the staircase.
> Now, when [K.M.] turned up as a 404B witness in my criminal case before it was dismissed, I went on a frantic search for anything and everything I could use. I wasn't looking for the tape. I've got bank records are at home -- I've got payroll stubs for every pay period except for two. There's two pay periods missing. I went through all that stuff. The tape turned up in all of that search.
> At that point when the case was dismissed, I placed it into a safety deposit box because I did not want to destroy it. I did not want to be accused of destroying evidence.

As is evident from his own testimony, Mr. Clifton told K.M. he had destroyed the recording while instead, he had been placed it with his business records. Then, as the above testimony illustrates, while the criminal case was pending against him, Mr. Clifton recovered the recording from his records and placed it in a safety deposit box. Thus, it is clear that when the stay was lifted from the disciplinary matter, which was *after* the criminal case was dismissed, Mr. Clifton was fully aware of the recording's existence. The testimony directly contradicts his statement in his Answer and Affirmative Defenses that he "no longer possessed the videotape." The record establishes that Mr. Clifton lied to the ODC.

35

## C. Conclusions of law

The ODC does not dispute the HPS's conclusion that Mr. Clifton violated Rules 1.7(b), 8.1(a), 8.4(b), 8.4(c), and 8.4(d). Mr. Clifton disputes only the conclusion that he violated Rules 1.7(b), 8.1(a), and 8.4(d), arguing that the reliable evidence does not establish that he violated these rules. Having already determined that Mr. Clifton's attacks on the HPS's factual findings are without merit, and having conducted a de novo review of the case, we find that the HPS's factual conclusions line up with our own: Mr. Clifton violated Rules 1.7(b), 8.1(a), 8.4(b), 8.4(c), and 8.4(d). We adopt the sound reasoning of the HPS with regard to its analysis of the Rule violations.

## D. Sanctions

Having settled the allegations and associated rule violations in this case, we now turn to deciding the appropriate sanctions to be imposed. The ODC maintains that the HPS's recommended sanctions were not severe enough, arguing that Mr. Clifton's law license should be annulled. To the contrary, Mr. Clifton argues that the recommended sanctions, while warranted to some degree, were too severe. He suggests that the proper sanction would be a public reprimand with a requirement that he continue counseling or therapy, complete continuing legal education in approved ethics courses, and that his practice be monitored. Alternatively, he proposes that "should this Court deem it necessary," he receive a "reasonable" suspension.

36

We have held, "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Blair*, 174 W. Va. 494, 327 S.E.2d 671. Like the HPS, when deciding on an appropriate sanction, the Court must consider the factors set forth in Rule 3.16 of the Rules of Professional Conduct:

> (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.

*Accord* syl. pt. 4, *Jordan*, 204 W. Va. 495, 513 S.E.2d 722. In examining these factors, we keep in mind that "attorney disciplinary proceedings are primarily designed to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice." *Comm. on Legal Ethics v. Keenan*, 192 W. Va. 90, 94, 450 S.E.2d 787, 791 (1994). Furthermore, "[i]n deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syl. pt. 3, *Comm. on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987). We have previously recognized that "[e]thical violations by a lawyer holding a public office are viewed as more egregious because of the betrayal of the public trust attached to the

37

office." Syl. pt. 3, *Comm. on Legal Ethics v. Roark*, 181 W. Va. 260, 382 S.E.2d 313 (1989). Furthermore, "Standard 5.22 of the ABA *Model Standards for Imposing Lawyer Sanctions* provides that a '[s]uspension is generally appropriate when a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules, and causes injury or potential injury to a party or to the integrity of the legal process." *Lawyer Disciplinary Bd. v. Amos*, 233 W. Va. 610, 618, 760 S.E.2d 424, 432 (2014).

It is apparent from the record before us that Mr. Clifton knowingly and intentionally violated a duty to his former client, the State. By engaging in sexual relationships with T.S., K.M., and L.B.—all of whom were, at some point during the time Mr. Clifton was an assistant prosecuting attorney, a victim, a defendant, or seeking help for another defendant—Mr. Clifton created a conflict of interest with his client. This same activity also violates his duty to the public and the legal system. As a public officer charged with the prosecution of criminal cases, abusing his position by engaging in sexual relationships with T.S., K.M., and L.B. impacted the fair administration of justice. Mr. Clifton acknowledged that his conduct, at least as far as the sexual banter and explicit photograph exchanges with T.S. are concerned, created "an inescapable negative reflection" on the legal profession. Finally, by providing false information to investigators regarding his relationship with T.S. and then by providing false information to the ODC regarding the recording of the sexual encounter between himself and K.M., Mr. Clifton violated a duty to the legal system and to the profession.

38

The amount of real injury in this case is great. As the HPS aptly surmised, it is not likely that the women who made the allegations against Mr. Clifton will be trusting of lawyers and the legal system in the future. By using his position as assistant prosecuting attorney to elicit sexual behavior from vulnerable women—women involved in criminal matters and/or seeking his help—he has damaged the prosecutor's office in Pocahontas County and the legal profession on the whole.

There are both aggravating factors—"factors that may justify an increase in the degree of discipline to be imposed," syl. pt. 4, in part, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003)—and mitigating factors—"factors that may justify a reduction in the degree of discipline to be imposed," syl. pt. 2, in part, *id.*—present in this case. The HPS determined that the aggravating factors were Mr. Clifton's selfish motive, pattern of misconduct, multiple offenses, illegal conduct, and the vulnerability of the victims. We agree with the HPS's observation that Mr. Clifton has "exhibited a pattern and practice of using the office of the prosecuting attorney and his position as assistant prosecuting attorney for his own sexual gratification." We determine that there are additional aggravating factors. Despite his assertion that he "has been fully compliant from the onset of the investigations culminating in the instant complaint," we find that Mr. Clifton did not fully cooperate with the ODC; while he did self-report the criminal indictment brought against him, he was untruthful about the continued existence

of the K.M. recording in his Answer and Affirmative Defenses. He also made false statements to the police and FBI investigators. Furthermore, the fact that the ethics violations occurred while Mr. Clifton served as assistant prosecuting attorney is an aggravating factor. *See Lawyer Disciplinary Bd. v. Scott*, 213 W.Va. 209, 579 S.E.2d 550 (2003) (determining that the lawyer's violation of Rules while holding public office was an aggravating factor); *Amos*, 233 W. Va. 610, 760 S.E.2d 424 (same). Mr. Clifton continues to deny that he used his position as assistant prosecutor to procure sexual conduct from vulnerable women, and he fails to show remorse for this behavior.

The mitigating factors the Court considers in deciding the appropriate sanction include:

> (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

Syl. pt. 3, in part, *id.* The HPS concluded that the absence of a prior disciplinary record and Mr. Clifton's inexperience in the practice of law are mitigating factors.[15] We also find Mr. Clifton has expressed some level of remorse, but only for engaging in sexual banter with and requesting explicit photographs from a person on probation and participating in Day Report. We find that the aggravating factors far outweigh the mitigating factors.

Upon our examination of the factors set forth in Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure as applied to our findings of fact and conclusions of law, we can reach no other conclusion than that the two-year suspension is inadequate. Mr. Clifton, in arguing for a lesser sanction, attempts to compare his case to one recently decided by this Court: *Lawyer Disciplinary Board v. Amos*, 233 W. Va. 610, 760 S.E.2d 424.

In *Amos*, the ODC filed a complaint against an assistant prosecuting attorney, Charles Amos, for an alleged violation of the Rules arising from his contact with a represented party, Ms. C., in a judicial proceeding in which Mr. Amos represented the West Virginia Department of Health and Human Resources ("DHHR"). 233 W. Va.

---

[15] Mr. Clifton asks this Court to consider letters submitted on his behalf by judges in Pocahontas County. These letters were not admitted into evidence before the HPS, were not considered by the HPS, and consequently, will not be considered by us.

at 612–13, 760 S.E.2d at 426–27. Ms. C. alleged during a meeting with her attorney, the prosecutor, and representatives of the DHHR that she believed Mr. Amos would help her in the abuse and neglect proceeding instituted against her if she engaged in sexual contact with him after he told her, "[I]f you scratch my back, I'll scratch yours." *Id.* at 614, 760 S.E.2d at 428. Ms. C. failed to appear and testify to the same before the HPS. *Id.* "Consequently, there was no affirmative evidence before the Hearing Panel regarding Ms. C.'s allegations of Mr. Amos's sexual overtures, other than Mr. Amos's denials of the same." *Id.* The ODC and Mr. Amos submitted joint stipulations of findings of fact and conclusions of law, recommending that the HPS sanction Mr. Amos by, among other things, suspending his law license for seventy-five days. *Id.* at 615, 760 S.E.2d at 429. The Court disagreed with the HPS's recommended sanction of a public reprimand, determining that a seventy-five day suspension, along with other sanctions, was appropriate. *Id.* at 619, 760 S.E.2d at 433.

We find that *Amos* is not comparable to the present matter. In *Amos*, the Court examined a situation involving the allegations of one woman. In this case, *three* women made allegations. Additionally, in *Amos*, no affirmative evidence was presented to support the claim that Mr. Amos offered to help Ms. C. with her case in exchange for sex. In this case, however, three different women appeared before the HPS and testified that Mr. Clifton had sexual contact with them. Further, in *Amos*, there was no evidence presented that Ms. C. ever alleged that she had sex with Mr. Amos, whereas in the

42

present case, three women testified to engaging in sexual contact with Mr. Clifton. T.S. stated that Mr. Clifton implied that it would be to her detriment if she did not have sexual contact with him. Thus, greater sanctions than those ordered in *Amos* are warranted in this case.

We believe that *In re Scott*, No. 99-102-0092, 2001 WL 34402628 (Va. State Bar Disciplinary Bd. 2001), unlike *Amos*, is comparable. In *Scott*, the Virginia State Bar Disciplinary Board ("the Board") examined allegations that Zane Bruce Scott, an Assistant Commonwealth's Attorney in Virginia, used his public position to have sex with two women who had criminal charges pending against them. With regard to the first woman, R.C., the Board's decision states that she

> engaged in the sexual relations as a direct result of coercion and intimidation exercised upon her by Scott, growing out of his prosecutorial powers in her two felony cases. In explaining why she did not resist going into the motel with Scott, [R.C.] testified, "I felt I had the choice between that motel room and a jail cell."

2001 WL 34402628 at *2. With regard to the second woman, K.B., the Board found that Mr. Scott indicated to K.B. that if she had sexual relations with him, "he would make sure any pending indictments were dismissed." *Id.* at *3. The Board found that K.B. and Mr. Scott had sexual relations in his office. *Id.*

The Board decided to revoke Mr. Scott's law license, reasoning:

43

The Board then deliberated and determined that the proper disposition of this misconduct is revocation. There are numerous factors that make this conduct particularly egregious. The awesome powers of a prosecutor in relation to an accused place on the prosecutor the high duty to remain true to his oath. Misuse or abuse of these powers not only can result in harm to the accused, but also can result in improperly compromised prosecutions and/or faulty convictions.

. . . .

[I]t is hard to envision a pattern of lawyer misconduct more predatory than this. It is damaging to the profession as a whole. Scott refuses to acknowledge the extent of his professional misconduct. Instead he has compounded it with his untruthfulness.

*Id.* at \*3–\*4.

We find that *Scott* provides the proper model for sanctions in this case. The severity of Mr. Clifton's unethical conduct surpasses that described in *Scott*; Mr. Clifton used his position as assistant prosecuting attorney to take advantage of three women on multiple occasions. Furthermore, Mr. Clifton lied to investigators and to the ODC. Given the facts before us, we conclude that he is unfit to practice law, and that the annulment of his law license is necessary to protect the public, to reassure the public as to the reliability and integrity of attorneys, and to safeguard the interest in the administration of justice.

## IV.  CONCLUSION

We find no error in the HPS's findings of fact and conclusions of law; however, we disagree with the HPS's recommended sanctions, determining that Mr.

Clifton's intentional and repeated violations of the Rules warrant the annulment of his law license. We therefore order the annulment of Mr. Clifton's license to practice law in the State of West Virginia,[16] and we further order that he reimburse the LDB for the costs it incurred in connection with these proceedings.

License annulled.

---

[16] Pursuant to Rule 3.33(b) of the West Virginia Rules of Lawyer Disciplinary Procedure, Mr. Clifton may apply for reinstatement of his law license in five years. The rule provides that one seeking reinstatement of his or her law license

> may file a verified petition in the Supreme Court of Appeals reciting the cause of such annulment and what the person shall have done in satisfaction of requirements as to rehabilitation, restitution, conditions or other acts incident thereto, by reason of which the person should be reinstated as a member of the state bar and his or her license to practice law restored. The petitioner shall also file a completed reinstatement questionnaire provided by the Office of Disciplinary Counsel. At the time of filing the petition and questionnaire with the Clerk of the Supreme Court of Appeals, the petitioner shall also file a copy of each with the Office of Disciplinary Counsel . . . .

We observe if the Court grants a petition for reinstatement, the Court may place conditions on reinstatement. W. Va. Rules of Lawyer Disciplinary Procedure 3.33(f).