452 S.E.2d 377

The COMMITTEE ON LEGAL ETHICS
OF THE WEST VIRGINIA STATE
BAR, Complainant,

v.

Thomas H. McCORKLE, A Member
of the West Virginia State Bar,
Respondent.

No. 22315.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 13, 1994.

Decided Nov. 18, 1994.

Sherri D. Goodman, Chief Disciplinary Counsel Committee on Legal Ethics of The West Virginia State Bar Charleston, for complainant.

Joseph W. Caldwell, Caldwell, Cannon–Ryan & Riffee, Charleston, for respondent.

CLECKLEY, Justice:

On June 3, 1994, we received this verified complaint from the West Virginia State Bar Committee on Legal Ethics (Committee) pursuant to Section 19 of Article VI of the Constitution, By–Laws and Rules and Regulations of the West Virginia State Bar.[1] The Committee found that Thomas H. McCorkle, a member of the State Bar, used cocaine and crack cocaine, engaged in improper solicitation of clients, and testified falsely before the Hearing Panel Subcommittee with respect to the solicitation charge. For these violations of the Code of Professional Responsibility, the Committee recommends that Mr. McCorkle's license to practice law in West Virginia be suspended for two years and that he be required to obtain treatment and counseling to deal with his drug and alcohol problems. The Committee further recommends that

1. Section 19 of Article VI states:

"In any such case wherein the committee determines to institute proceedings in the supreme court of appeals, the committee shall cause a verified complaint to be prepared, addressed to said court, concisely setting forth the facts of the case, the reasons and grounds assigned for a public reprimand or the suspension or annulment of the accused's license, and the committee's prayer as to action and relief sought thereon. Such complaint, together with a certified copy of the committee report as provided in section seventeen of this article, shall be transmitted to and filed in the supreme court of appeals by delivery to the clerk thereof."

Mr. McCorkle reimburse the Committee for the cost of this disciplinary proceeding, in the amount of $3,583.32, and apply for reinstatement at the end of his suspension. After reviewing the record in this case, we find the Committee's findings to be proper, and we adopt their recommended sanctions.

## I.

## DISCIPLINARY PROCEEDINGS

### A. *Burden of Proof at the Hearing*

■ The Committee is required to prove its allegations against an attorney at law by clear and convincing evidence. In Syllabus Point 1 of *Committee on Legal Ethics v. Burdette*, 191 W.Va. 346, 445 S.E.2d 733 (1994), we stated the following well established burden of proof:

> " ' " 'In a court proceeding initiated by the Committee on Legal Ethics of the West Virginia State Bar to annul [or suspend] the license of an attorney to practice law, the burden is on the Committee to prove, by full, preponderating and clear evidence, the charges contained in the Committee's complaint.' Syllabus Point 1, *Committee on Legal Ethics v. Pence*, [——] W.Va. [——], 216 S.E.2d 236 (1975)." Syl. pt. 1, *Committee on Legal Ethics v. Tatterson*, [173] W.Va. [613], 319 S.E.2d 381 (1984).' Syllabus Point 1, *Committee on Legal Ethics v. Tatterson*, 177 W.Va. 356, 352 S.E.2d 107 (1986)."

■ In *Committee on Legal Ethics v. White*, 189 W.Va. 135, 138, 428 S.E.2d 556, 559 (1993), which involved a situation in which an attorney at law pled guilty to possession of illicit drugs, we stated:

> "Where there has been a final criminal conviction, proof of ethical violations is controlled by Syllabus Point 2 of *Committee*

*on Legal Ethics v. Six*, 181 W.Va. 52, 380 S.E.2d 219 (1989):

> " 'Where there has been a final criminal conviction, proof on the record of such conviction satisfies the Committee on Legal Ethics' burden of proving an ethical violation arising from such conviction.' " "

### B. *Standard Before the Supreme Court on Review*

When a disciplinary action is reviewed by this Court, different standards apply. The standards of judicial review applicable in such matters reflect the respective roles and responsibilities of the Committee and this Court in cases involving lawyer discipline.

In *Daily Gazette Co., Inc. v. Committee on Legal Ethics*, 174 W.Va. 359, 326 S.E.2d 705 (1985), we emphasized that Section 3 of Article VIII of the West Virginia Constitution vests in this Court "the exclusive authority to regulate and control the practice of law in this State." Syllabus Point 1, in part.[2] In the exercise of this plenary authority to regulate and control the practice of law, we have delegated to the State Bar and to the Committee certain administrative, investigative, and adjudicatory functions. In carrying out those functions, the State Bar and the Committee act "as an administrative arm" of the Court. Syllabus Point 2, in part, *Daily Gazette, supra*.

Thus, our power to control the lawyer disciplinary process is constitutional in origin. When we act pursuant to that power our touchstone must be vindication of the public's interest in the integrity of the administration of justice.[3] In every case involving a review of the results of a Committee disciplinary proceeding, we are cognizant of this solemn

---

**2.** Section 3 of Article VIII provides, in relevant part: "The court shall have power to promulgate rules ... for all of the courts of the State relating to ... practice and procedure, which shall have the force and effect of law[.]"

**3.** Our obligation to protect the public's interest in the integrity of our legal system lies at the heart of the work of this Court:

"Because the legal system embraces the whole of society, the public has a vital expectation

that it will be properly administered. From this expectancy arises the concept of preserving public confidence in the administration of justice by disciplining those lawyers who fail to conform to professional standards."

*In re Brown*, 166 W.Va. 226, 232, 273 S.E.2d 567, 570 (1980). *See also Committee on Legal Ethics v. Mullins*, 159 W.Va. 647, 226 S.E.2d 427 (1976).

responsibility owed to the citizens of this State and to the rule of law.

In our prior decisions, however, we have not always been clear as to the standard of judicial review applicable to lawyer disciplinary actions. We have vacillated between the "independent assessment" and "substantial deference" standards. Moreover, we have said that both legal and factual findings of the Committee are entitled to "substantial consideration."[4] Although we believe that these standards are not necessarily incompatible when properly applied, we recognize that when not applied with precision they lack clarity and may cause confusion. Therefore, we take this opportunity to resolve any doubt as to the applicable standard of judicial review.

Different standards apply when we review the Committee's conclusions of law, the application of the law to the facts, and the appropriate discipline as opposed to the Committee's factual findings. This Court reviews de novo questions of law and the appropriateness of a particular sanction. However, with respect to the findings of fact, the appropriate standard of judicial review requires that we defer to the Committee unless the findings are not supported by "reliable, probative and substantial evidence on the whole record."[5]

With regard to this standard, we have said in *In re Brown*, 166 W.Va. 226, 236, 273 S.E.2d 567, 572 (1980):

"[M]ost courts will give some weight to the recommendations of the Ethics Committee that conducts the reinstatement hearing simply because the Committee, having heard the witnesses, is in a better position to evaluate their testimony. This does not mean that the court is foreclosed from making an *independent assessment of the record* but it does mean absent a showing of some mistake of law or arbitrary assessment of the facts such recommendations made by the Ethics Committee in regard to reinstatement of an attorney are to be given substantial consideration. *Tardiff v. State Bar*, 27 Cal.3d 395, 612 P.2d 919, 165 Cal.Rptr. 829 (1980); *In re Wigoda*, 77 Ill.2d 154, [32 Ill.Dec. 341] 395 N.E.2d 571 (1979); *In re Hiss*, 368 Mass. 447, 333 N.E.2d 429 (1975); *In re Freedman*, 406 Mich. 256, 277 N.W.2d 635 (1979); *Petition of Harrington*, 134 Vt. 549, 367 A.2d 161 (1976)." (Emphasis added).

Simply stated, "independent assessment" requires us to engage in what is essentially a *de novo* review of the record. Even here, we accord due weight to the conclusions and recommendations of the Committee. To ignore these recommendations and conclusions would render the Committee's important adjudicatory role a useless gesture and deprive this Court of the most important benefit of its collective and evaluative judgment.

However, while the Committee's conclusions and recommendations are given respectful consideration,[6] they are not binding

---

**4.** See Syllabus Point 1, *Committee On Legal Ethics v. Hobbs*, 190 W.Va. 606, 439 S.E.2d 629 (1993), where we said: " 'Absent a showing of some mistake of law or arbitrary assessment of the facts, recommendations made by the State Bar Ethics Committee ... are to be given substantial consideration.' Syl.Pt. 3, in part, *In re Brown*, 166 W.Va. 226, 273 S.E.2d 567 (1980)."

**5.** This "substantial evidence" standard also is used in judicial review of formal adjudicatory actions of administrative agencies under the West Virginia Administrative Procedures Act (APA), W.Va.Code, 29A–5–4(g)(5) (1964). However, when the State Bar acts as an administrative arm of this Court in lawyer disciplinary matters, it is not an "agency" subject to the APA. *See* W.Va.Code, 29A–1–2(a) (1982). Notwithstanding this fact, we believe that the level of judicial deference for this Court to use when reviewing the Committee's findings regarding

factual matters should be the "substantial evidence" standard.

**6.** There is potential for confusion engendered by our use of the term "substantial consideration" in connection with both (1) *de novo* review of the law and recommendations of sanctions, as well as (2) our more deferential review of the Committee's factual findings. To dispose of this confusion, we clarify that when the term "substantial consideration" has been used in prior cases in the context of *de novo* review, it should be interpreted to mean "respectful consideration." "Respectful consideration" is a term which recognizes the important role played by the Committee, without circumscribing our responsibility to make an independent *de novo* evaluation. *See Committee on Professional Ethics & Conduct v. Gardalen*, 414 N.W.2d 124, 125 (Iowa 1987) ("We have held that the commission's findings and recommendations are given respectful con-

on this Court. Consistent with the supervisory function mandated by Section 3 of Article VIII of our Constitution, this Court independently examines each case on its own merits in determining what, if any, disciplinary action is warranted. Thus, with regard to the conclusions of law, the application of the law to the facts, and the appropriate discipline, the *de novo* standard of judicial review applies.[7]

Factual findings of the Committee are reviewed under a different standard. Unlike issues of law, the application of the law to the facts, and a determination of appropriate discipline, we realize that the Committee is in a better position than this Court to resolve the factual disputes which may arise in a case. The Committee hears the testimony of the witnesses firsthand and, being much closer to the pulse of the hearing, is much better situated to resolve such issues as credibility.[8]

■ As observed above, we have said in prior cases that "substantial consideration" must be given to the factual findings and factual conclusions of the Committee. *Committee on Legal Ethics v. Hobbs*, 190 W.Va. 606, 439 S.E.2d 629 (1993). To be clear, in the context of our review of the Committee's findings of fact, "substantial consideration" means that such factual findings and conclusions are to be given substantial deference by this Court.[9] The burden is on the attorney at law to show that the factual findings are not supported by reliable, probative, and substantial evidence on the whole adjudicatory record made before the Committee.

■ In summary, a *de novo* standard applies to a review of the adjudicatory record made before the Committee as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

sideration although they are not binding on this court").

7. *De novo* in this context means that, notwithstanding the Committee's conclusions of law, application of the law to the facts, and recommended discipline, the Court will exercise its own independent judgment in reaching a final decision.

8. *See, e.g., Disciplinary Matter Involving West*, 805 P.2d 351, 353 n. 3 (Alaska 1991), in which the Alaska court stated:

"Though this court has the authority, if not the obligation, to independently review the entire record in disciplinary proceedings, findings of fact made by the Board are nonetheless entitled to great weight. The deference owed to such findings derives from the responsibility to conduct disciplinary proceedings which this court has delegated to the Bar Association. Where findings of fact entered by the Board are challenged on appeal to this court, ... the respondent attorney bears the burden of proof in demonstrating that such findings are erroneous.... As a general rule, moreover, we ordinarily will not disturb findings of fact made upon conflicting evidence[.]"

9. While this standard of review is deferential, it should not be seen in any way as requiring this Court to "rubber stamp" the Committee's factual findings. In another context (judicial review of informal agency action under the federal Administrative Procedures Act, 5 U.S.C. § 706 (1964 ed., Supp. V), the Supreme Court of the United States distinguished judicial review and judicial abdication of the review function. Speaking for the Court, Justice Marshall observed that a deferential standard of judicial review does not "shield ... [an agency's action] from thorough, probing, in-depth review." The Supreme Court emphasized, however, that "the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136, 153 (1971). Justice Marshall's admonition in *Overton Park* is applicable here. In every case involving lawyer discipline, we will *review* the Committee's findings of fact and not rubber stamp them. Only by giving due deference to such factual findings *and* by carefully reviewing the record can we properly perform our reviewing task. *See also Matter of Disciplinary Action Against Larson*, 485 N.W.2d 345, 346 (N.D.1992), wherein the North Dakota court quoted *In re Larson*, 450 N.W.2d 771, 773–74 (N.D.1990):

" 'In reviewing the record, we accord due weight to the findings, conclusions, and recommendations of the hearing panel.... However, this Court does not act as a mere "rubber stamp" approving the findings and recommendations of the Disciplinary Board after a perfunctory review.... In determining what discipline is warranted, each case must be decided on its own particular facts.' "

## II.

## DRUG USE

The Committee found that Mr. McCorkle used cocaine and crack cocaine in violation of state and federal laws. Mr. McCorkle testified that he did use cocaine and/or crack cocaine from the late 1980's until May 1992 on a regular basis.[10] In July of 1992, he was arrested and subsequently pled guilty to possession of cocaine.[11]

█ Mr. McCorkle asserts two arguments to support his defense of these charges. First, he claims that the Committee is attempting to turn him into a "scapegoat" and that less severe punitive measures, such as community service, would be more appropriate. This argument fails to take into consideration the multi-purpose of disciplinary sanctions. This Court has long recognized that a disciplinary action may serve as a deterrent to other attorneys. We stated in Syllabus Point 2 of *Committee on Legal Ethics v. White*, 189 W.Va. 135, 428 S.E.2d 556 (1993):

> " ' "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syllabus Point 3, *Committee on Legal Ethics v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987).' Syllabus Point 5, *Committee on Legal Ethics v. Roark*, 181 W.Va. 260, 382 S.E.2d 313 (1989)."

Mr. McCorkle also argues that the Committee failed to consider the mitigating factors in his case. Evidence was submitted that he suffers from hypothyroidism, generalized anxiety disorder, and unipolar depression. He contends that these illnesses con-

tributed to his drug and alcohol problems. Of particular concern is the fact that admittedly Mr. McCorkle's drug abuse stemmed from his alcohol abuse, yet he continues to drink. This behavior places him at risk of relapsing into the drug abuse. We believe the Committee did consider these medical problems and is attempting to help Mr. McCorkle in his efforts by recommending treatment and counseling. We fail to see how his medical condition relates to the solicitation charge and the more egregious false testimony charge which is discussed below.

, █ Mr. McCorkle proposes a lessening of the severity of the recommended suspension. He suggests a six-month suspension, after which he could practice law under the supervision of another attorney at law for eighteen months. He further suggests that he be ordered to perform *pro bono* legal work for defendants in drug and alcohol cases and to submit to random drug testing during this time.

We reject Mr. McCorkle's proposal because we believe the Committee's recommended sentence appropriately exhibits the severity of this case. When reviewing sanctions, this Court considers the case as a whole and not merely one of multiple charges. Mr. McCorkle's illicit drug and alcohol abuse clearly was not an isolated instance. In fact, the record reflects nearly a decade of flagrant disregard for the integrity of the legal profession. A two-year suspension is more than fair considering this evidence and the following evidence on solicitation.

## III.

## IMPROPER SOLICITATION AND FALSE TESTIMONY

The complaint alleges that Mr. McCorkle

---

10. The cocaine use after January 1, 1989, the effective date of the current Rules of Professional Conduct, violated Rule 8.4 which states: "It is professional misconduct for a lawyer to: ... (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects[.]"

11. Mr. McCorkle pled guilty to violating 21 U.S.C. § 844 (1988), possession of cocaine base, before the Honorable Jerry D. Hogg, Magistrate Judge for the United States District Court for the Southern District of West Virginia. Random drug screening is a condition of his sentence of probation.

292

improperly solicited clients [12] by using a "runner" who worked in a local hospital, fabricated evidence, and testified falsely before the Committee in regard to this charge.

The evidence indicates that Mr. McCorkle was acquainted with Richard (Rick) Scott, who worked in the emergency room of Charleston Area Medical Center (CAMC). CAMC and the Committee received complaints that Mr. Scott approached accident victims in an attempt to solicit business for Mr. McCorkle's personal injury practice.[13]

More specifically, testimony from Aleta Scarbro shows that she and her son were involved in a car accident on Saturday, February 13, 1993, and were treated at CAMC. Mrs. Scarbro did not return to her home until Sunday afternoon. A call was made from Mr. McCorkle's office to Mrs. Scarbro's home at 1:10 p.m. on Sunday.[14] The following Tuesday, February 16, 1993, Rick Scott called Mrs. Scarbro and asked her to consider retaining Mr. McCorkle if she wanted to file a lawsuit. Two days later, Mrs. Scarbro then received a call from Mr. McCorkle. He asked her to come to his office to discuss her case.

Mr. McCorkle admitted that he attempted to call Mrs. Scarbro on the Sunday following her accident. He claimed to be returning her call. He produced a phone message dated Sunday, February 14, 1993, that was supposedly taken by his receptionist. After admitting that the receptionist did not work on Sunday, he claimed she may have been mistaken about the date and that it could have been the preceding Friday or Saturday. This explanation is not plausible because Mrs. Scarbro would not have called prior to the accident.

Margaret Hudnall testified that Mr. McCorkle called her residence to inquire about her husband after he had been treated at CAMC for injuries sustained in a car accident that occurred in February, 1993. The call was an attempt to solicit business. Mr. Hudnall was unable to take the call, but he later returned the call. He was very agitated and wanted to know how Mr. McCorkle received his telephone number and information regarding his accident. Mr. Hudnall reported this incident to the hospital.

Mr. McCorkle contends that he placed the call to Mr. Hudnall after he received a phone message that stated "call Mr. Hudnall, re: referral Dave." However, he could not remember who Dave was and no other evidence concerning Dave's identity was introduced at the hearing.

Eunice McClanahan testified that on November 25, 1992, she was waiting in the emergency room at CAMC as her son underwent emergency surgery for serious injuries he received in a car accident. She was approached by a hospital worker who advised her to talk to a lawyer. The hospital worker told her "I work for attorneys and if I need help, they will help me." The man gave her a lawyer's business card. She remembered the card had the name "McCorkle" on it, but she no longer had the card. She notified the hospital of the incident and, after looking at several pictures presented to her, identified Mr. Scott as the man who handed her the card.

Furthermore, the evidence shows that Lisa Addington was approached by Rick Scott while she was in the emergency room at CAMC. They discussed her accident and whether she would like to meet with Mr.

**12.** Rule 7.3 of the Rules of Professional Conduct states, in pertinent part:

"(a) A lawyer shall not by in-person or telephone contact solicit professional employment from a prospective client with whom the lawyer has no family or prior professional relationship when a motive for the lawyer's doing so is the lawyer's pecuniary gain.

"(b) A lawyer shall not solicit professional employment from a prospective client by written or recorded communication or by in-person or telephone contact even when not otherwise prohibited by paragraph (a), if:

"(1) the prospective client has made known to the lawyer a desire not to be solicited by the lawyer; or

"(2) the solicitation involves coercion, duress or harassment."

**13.** As a result of these actions, Mr. Scott was terminated from his employment with CAMC.

**14.** No one was home, but the answering machine picked up the call.

McCorkle. Mr. Scott later transported Ms. Addington from her apartment to Mr. McCorkle's office. He remained in the office during the consultation. Mr. Scott explained that Ms. Addington was the sister of a fellow friend and co-worker and he was just trying to help.

Despite the foregoing, Mr. Scott and Mr. McCorkle denied that any client solicitation agreement had been discussed or reached. However, the evidence shows that during this period of time, Mr. Scott was laid off from the coal mines and was earning substantially less than he received when he worked as a miner. He frequently would drop in Mr. McCorkle's office to see if any coal mining jobs were available.[15] Based on this direct and circumstantial evidence, we agree with the Committee that Mr. Scott solicited clients on Mr. McCorkle's behalf in an attempt to receive help from Mr. McCorkle in finding a new job.

We find that the Committee has met its burden of proof regarding the charges of improper solicitation. A pattern and practice of improper solicitation was clearly established. We also find that Mr. McCorkle presented false testimony to the Committee when he claimed he was returning phone calls to Mrs. Scarbro and to the Hudnall residence. Furthermore, we agree with the Committee's finding that the phone message he produced was manufactured to support his claim. These violations of the Code of Professional Responsibility are very serious. Even if we did not consider the drug charges, these charges would warrant Mr. McCorkle's suspension from the practice of law.

## IV.

## CONCLUSION

For the foregoing reasons, this Court orders the suspension of Mr. McCorkle's license to practice law for two years, orders him to pay the cost of this proceeding, and orders him to undergo treatment and counseling to deal with his drug and alcohol abuse. A description of the treatment program is to be provided to the West Virginia

15. Mr. McCorkle apparently had contacts in the coal industry.

State Bar no less than every ninety days. Mr. McCorkle is required to apply for reinstatement at the expiration of his two-year suspension.

Two-year suspension, treatment for drug and alcohol abuse, application for reinstatement required, and payment of costs.