IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2026 Term

No. 24-376

**FILED**
**March 27, 2026**
**released at 3:00 p.m.**
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LAWYER DISCIPLINARY BOARD,
Petitioner,

v.

PHILLIP S. ISNER,
Respondent.

Lawyer Disciplinary Proceeding
Nos. 22-02-471, 22-02-484, 23-02-163, 23-02-262,
23-02-362, 24-02-047, and 24-02-050

LAW LICENSE SUSPENDED AND OTHER SANCTIONS

Submitted: January 27, 2026
Filed: March 27, 2026

Rachael L. Fletcher Cipoletti, Esq.
Chief Lawyer Disciplinary Counsel
Renee N. Frymyer, Esq.
Lawyer Disciplinary Counsel
Office of Lawyer Disciplinary Counsel
Charleston, West Virginia
Attorneys for Lawyer Disciplinary Board

Jeremy B. Cooper, Esq.
Blackwater Law PLLC
Pittsburgh, Pennsylvania
Attorney for Respondent

CHIEF JUSTICE BUNN delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      "A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Hearing Panel Subcommittee's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Hearing Panel Subcommittee's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syllabus Point 3, *Comm. on Legal Ethics of W. Va. State Bar v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

2.      "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syllabus Point 3, *Comm. on Ethics of W. Va. State Bar v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

3.      "Rule 3.7 of the Rules of Lawyer Disciplinary Procedure[] . . . requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence." Syllabus Point 1, in part, *Law. Disciplinary Bd. v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995).

4.	"Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.'" Syllabus Point 4, *Off. of Law. Disciplinary Couns. v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

5.	"In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syllabus Point 3, *Comm. on Legal Ethics of W. Va. State Bar v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).

**BUNN, Chief Justice:**

The Hearing Panel Subcommittee of the Lawyer Disciplinary Board ("HPS") found that respondent Phillip S. Isner committed twenty-five[1] violations of the West Virginia Rules of Professional Conduct arising from a seven-count Statement of Charges issued in July 2024. The Statement of Charges alleges primarily that Mr. Isner failed to properly communicate with his clients, diligently and competently expedite litigation consistent with their interests, timely prepare orders as required by tribunal rules, and perfect an appeal. The HPS recommended that Mr. Isner be suspended from the practice of law for one year, refund $2,500 to one client, and pay the costs associated with these proceedings. Mr. Isner objects to the HPS's recommendation, challenging its findings as to Counts 2 and 6 and its recommended sanction. The Office of Lawyer Disciplinary Counsel (hereinafter "ODC") argues in support of the HPS's findings and recommendations in their entirety.

Based on this Court's independent review, we find that Mr. Isner committed twenty-four violations of the Rules of Professional Conduct arising from the allegations contained in the Statement of Charges and the evidence presented to the HPS. We accept

---

[1] Although ODC calculates twenty-eight violations, we attribute this discrepancy to a lack of clarity in the Statement of Charges. We find that the Statement of Charges separately alleges, and the HPS found, twenty-four violations as well as an additional, uncharged violation in Count 2, for a total of twenty-five violations. Because we reject one violation contained in Count 5, we find twenty-four separate violations of the Rules of Professional Conduct. *See* discussion *infra*.

1

the HPS's recommended sanctions and suspend Mr. Isner from the practice of law for one year, along with other sanctions as more fully set forth herein.

## I.

## FACTS AND PROCEDURAL HISTORY

Mr. Isner was admitted to the West Virginia State Bar in 2003 and practices in Elkins, West Virginia; he contends his practice currently consists of eighty percent abuse and neglect litigation and the remainder criminal defense. This Court previously admonished Mr. Isner in 2017 and 2020 for multiple violations of the West Virginia Rules of Professional Conduct, including Rule 1.3 regarding diligence and Rule 1.4 regarding communication with clients, among other related violations. In July 2022, the Investigative Panel of the Lawyer Disciplinary Board issued a three-count Statement of Charges against Mr. Isner alleging violations of most of the same Rules implicated in the current 2024 charges, including additional violations of Rules 1.3, 1.4, 3.2, 3.4 and 8.4. The Court reprimanded him for nine violations and ordered two years' supervised practice that commenced in August 2023.[2]

The 2024 Statement of Charges at issue here involves seven complaints (two of which are related) alleging Mr. Isner's lack of diligence, competence, and his failure to

---

[2] In February 2025, the Court found Mr. Isner in contempt of our disciplinary order requiring him to pay the costs of the proceedings, provide proof of compliance with his enhanced continuing legal education requirement, and submit monthly supervision reports to ODC. Mr. Isner purged himself of this contempt and resumed his supervised practice.

communicate and expedite litigation, among other associated rule violations. In general, the complainants allege that they retained Mr. Isner to do work which he did not timely or competently perform, that he did not communicate with them, that he failed to appear for appointments, and was otherwise unreachable to discuss their cases; three complain of his failure to return property or money at end of his representation. Apart from certain of the violations alleged in Counts 2 and 6, Mr. Isner admitted the majority of the alleged rule violations in either his answer to the Statement of Charges or by conceding them in the proposed findings he submitted following the evidentiary hearing before the HPS.[3]

*Count 1—Danielle George*

Mr. Isner represented Ms. George in domestic litigation for approximately two years. Her 2022 disciplinary complaint alleged that Mr. Isner was found in contempt six times for failure to timely file orders. Ms. George also complained that she could not reach Mr. Isner by phone, that he failed to calendar court dates and timely advise her of cancelled hearings, that he lost photos and other documents related to her case, and that he failed to timely and properly prepare a qualified domestic relations order ("QDRO"). Before the HPS, Ms. George testified that she worried the notices of contempt would be held against her by the family court, and her concern was compounded by Mr. Isner's consistent refusal to return her phone calls to discuss the notices.

---

[3] In many of those admissions, however, Mr. Isner characterized the violations as merely "technical violations."

Mr. Isner denied being found in contempt in Ms. George's case, explaining that when an order is not timely submitted,[4] the family court issues a "Notice of Contempt/Rule to Show Cause," which is then dismissed if an order is submitted before a date certain. Although the record contains multiple notices of contempt, Mr. Isner claimed to have escaped a finding of contempt by submitting the orders after receipt of the notices. However, contrary to Mr. Isner's assertion, the record contains one "Order Finding Contempt" that was issued after Mr. Isner failed to appear for a show cause hearing regarding his failure to timely submit an order.[5] Before the HPS, Mr. Isner admitted that he "absolutely" did not timely prepare the QDRO but claimed to have many documented phone calls and texts with Ms. George demonstrating his responsiveness.[6]

Nonetheless, Mr. Isner admitted that he violated Rule 1.3's[7] diligence requirement by failing to timely prepare and submit the QDRO, the communication

[4] Rule 22(b) of the Rules of Practice and Procedure for Family Court provides that "[a]n attorney assigned to prepare an order or proposed findings shall deliver the order or findings to the court no later than ten days after the conclusion of the hearing[.]"

[5] Further, the notices of contempt submitted into evidence by ODC indicate that they were not perfunctorily issued by the court upon non-receipt of an order, as claimed by Mr. Isner. Instead, the notices state they were issued after Mr. Isner "failed to respond to calls and emails" from the court about the outstanding orders.

[6] Although on May 11, 2023, Mr. Isner claimed to have prepared two QDROs in Ms. George's case, the docket sheet contained in the record reflects that a proposed QDRO was not submitted until June 6, 2023.

[7] "A lawyer shall act with reasonable diligence and promptness in representing a client." W. Va. R. Pro. Conduct 1.3.

requirements contained in Rules 1.4 (a)(3)[8] and 1.4 (a)(4)[9] by failing to provide information and respond to Ms. George's inquiries, and Rule 3.4(c)'s[10] prohibition on knowing disobedience of tribunal rules by his failure to timely submit orders. The HPS also found a Rule 1.16(d)[11] violation resulting from Mr. Isner's failure to return Ms. George's photos and other papers at the end of his representation.

*Count 2—Adam Kramer*

In his December 2022 complaint, Mr. Kramer alleged that Mr. Isner represented him in multiple family court matters during which Mr. Isner regularly failed to show up to scheduled meetings or respond to emails or calls, appeared at hearings unprepared, failed to return Mr. Kramer's personal property including baby photos and a journal, and failed to pay a guardian ad litem bill despite being provided funds for that purpose by Mr. Kramer. Mr. Kramer complained that Mr. Isner's work often took much longer than anticipated or promised and required correction when it was finally completed;

---

[8] "A lawyer shall[] . . . (3) keep the client reasonably informed about the status of the matter[.]" W. Va. R. Pro. Conduct 1.4(a)(3).

[9] "A lawyer shall[] . . . (4) promptly comply with reasonable requests for information[.]" W. Va. R. Pro. Conduct 1.4 (a)(4).

[10] "A lawyer shall not[] . . . (c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists[.]" W. Va. R. Pro. Conduct 3.4(c).

[11] "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property to which the client is entitled [.]" W. Va. R. Pro. Conduct 1.16(d).

while deadlines approached, Mr. Kramer alleged he could not reach Mr. Isner by phone to inquire about the status of his case.

Before the HPS, Mr. Kramer testified that Mr. Isner's communication was "[s]poradic at best" and that Mr. Isner "rarely" returned phone calls. Mr. Kramer testified that one of the orders Mr. Isner failed to prepare for over a year was designed to reduce his child support and, because of the delay, Mr. Kramer paid three times the amount he was supposed to pay during that time. Mr. Kramer's wife also testified, confirming that Mr. Isner failed to appear for meetings, was late for appointments, failed to return calls, and that she and Mr. Kramer repeatedly requested billing statements that were not provided. She testified that Mr. Isner lost a text thread that she felt was critical to their case and that it was "embarrassing" to have to learn what was happening in the case from opposing counsel. Because of Mr. Isner's failure to timely perform work or respond to their inquiries, Mrs. Kramer testified that she and Mr. Kramer felt "helpless"; Mr. Kramer attributed his current estrangement from his child, in part, to Mr. Isner's lack of expediency.

Mr. Isner responded that Mr. Kramer had retained him on multiple occasions from 2017 until 2022 and that the source of Mr. Kramer's frustration was a parenting plan mediation in which the mediator failed to memorialize the agreement, allegedly allowing the other party to renege. *See infra* n.23. Mr. Isner testified that Mr. Kramer was unreasonable in his demands and expectations, but in response to his concerns, Mr. Isner agreed to reduce his bill. Mr. Isner claimed that he had "countless" texts and phone calls

6

with Mr. Kramer, many of which were not billed, and that Mr. Kramer's complaints about litigation delays reflected Mr. Kramer's lack of legal knowledge. Regardless, Mr. Isner conceded that he was "overwhelmed" during his representation of Mr. Kramer but maintained that certain of the delays were "strategic."

Mr. Isner admitted no rule violations as to Count 2. However, the HPS found violations of Rule 1.3 for dilatory handling of the case, missing appointments, and delay in providing the requested bill and paying the guardian ad litem. For failing to respond to Mr. Kramer's inquiries and keep him informed, the HPS found violations of Rules 1.4(a)(3) and Rule 1.4(a)(4). Although not alleged in the Statement of Charges, the HPS found an additional violation of Rule 1.16(d) because Mr. Isner failed to return photos and other papers to Mr. Kramer at the end of his representation.

*Counts 3 and 4—ODC and Joy Timbrook*

In her June 2023 complaint, Joy Timbrook alleged that she hired Mr. Isner in July 2022 to intervene in a juvenile matter involving custody of her grandchild. The circuit court denied the request for intervention in October 2022 and on November 24, 2022, Mr. Isner timely filed a notice of appeal of that order. Ms. Timbrook alleged she heard nothing further about the matter until she attempted to contact Mr. Isner in May 2023 to ensure nothing would occur in the case over the summer due to an impending surgery. Although Mr. Isner's office staff communicated Mr. Isner's belief that he did not anticipate a "court date" in the next couple of months, Ms. Timbrook sensed something was amiss

7

and contacted this Court's clerk's office which advised that her appeal was dismissed in April 2023 for failure to perfect the appeal. Our Clerk referred the matter to ODC, and it opened a complaint.

Ms. Timbrook claimed Mr. Isner then evaded her call until she advised his office that she had spoken with our Court, at which point Mr. Isner agreed to speak with her. Mr. Isner explained that he did not inform her of the dismissal sooner because he was trying to craft a "fix" for the dismissal. Before the HPS, Ms. Timbrook testified that while Mr. Isner was allegedly trying to "fix" his failure to perfect the appeal, the adoption process for her grandchild began and was finalized shortly thereafter, foreclosing future custody efforts. She testified that the dismissal of the appeal "devastated" her and caused health problems.[12]

Mr. Isner responded that, when registering with the Court's e-filing system he mistakenly utilized his general office email address instead of his individual office email address, causing him to be unaware of the issuance of a scheduling order in the appeal. Mr.

---

[12] Ms. Timbrook further testified that Mr. Isner promised a refund, which she had not received as of the filing of her disciplinary complaint. Mr. Isner subsequently issued a refund check, but it was rejected for insufficient funds, prompting Mr. Isner's staff member to personally deliver a refund.

Isner denied attempting to avoid Ms. Timbrook's call about the appeal dismissal but conceded that he was "not prepared" to speak with her about the dismissal.[13]

Mr. Isner admitted to each of the rule violations alleged in these Counts. As to ODC's complaint, the HPS found violations of Rules 1.1 and 1.3 for Mr. Isner's lack of competence[14] and diligence, Rule 3.2[15] for his failure to expedite litigation, and Rule 8.4(d)[16] for misconduct prejudicial to the administration of justice. As to Ms. Timbrook's complaint, the HPS found additional violations of Rule 1.4(a)(3) for Mr. Isner's failure to notify Ms. Timbrook that the appeal was dismissed and Rule 8.4(c)[17] for misconduct involving dishonesty, fraud, deceit, or misrepresentation by misleading her about the status of the case.

---

[13] Mr. Isner testified that he contacted Jeremy Cooper, Esq., to assist Ms. Timbrook with any available relief against him, offering to pay his fees, but Ms. Timbrook claims Mr. Cooper failed to return her call. We note that Mr. Cooper now represents Mr. Isner in these proceedings involving Ms. Timbrook's complaint.

[14] "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." W. Va. R. Pro. Conduct 1.1.

[15] "A lawyer shall make reasonable efforts to expedite litigation consistent with the interest of the client." W. Va. R. Pro. Conduct 3.2.

[16] "It is professional misconduct for a lawyer to[] . . . (d) engage in conduct that is prejudicial to the administration of justice[.]" W. Va. R. Pro. Conduct 8.4(d).

[17] "It is professional misconduct for a lawyer to[] . . . (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" W. Va. R. Pro. Conduct 8.4(c).

*Count 5—David Cox*

In his 2023 complaint, Mr. Cox alleged that Mr. Isner represented his estranged wife in a family court proceeding in which Mr. Cox was self-represented. Similar to the allegations in Count 1, Mr. Cox complained that Mr. Isner "dr[ug] his feet" and was late in filing "almost every" order in the case, resulting in multiple notices of contempt as previously described. As in Count 1, Mr. Isner admitted that he failed to file orders within the requisite time frame but denied being held in contempt after he ultimately submitted the orders. Mr. Isner maintained that preparing the orders in the case was "exceptionally difficult[]" because Mr. Cox was self-represented and had a penchant for filing complaints against the involved parties; however, Mr. Isner denied that his delay prejudiced the case or Mr. Cox. For his failure to timely prepare the orders, Mr. Isner admitted to violations of Rule 1.3 for his lack of diligence, as well as Rule 3.4(c) prohibiting knowing disobedience of a tribunal rule and Rule 8.4(d) for misconduct prejudicial to the administration of justice.

*Count 6—Ronald Kesner*

In his 2024 complaint, Mr. Kesner alleged that he initially paid Mr. Isner a $2,500 retainer in 2019 for assistance with his parents' estate. After filing a will contest, Mr. Kesner claims Mr. Isner "didn't do anything with it," and refused to return phone calls or meet with him. Before the HPS, Mr. Kesner detailed work he did on his own to expedite his case including providing a list of deponents, setting up a room for the depositions, and filing the action himself. He claimed Mr. Isner was always late for scheduled meetings— once failing to show at all—and requested a full refund of his retainer.

Mr. Isner clarified that Mr. Kesner initially retained him to "investigat[e]" his mother's estate, which investigation was completed in 2016. Mr. Kesner then retained Mr. Isner to file an action to contest his father's will in 2021, paying a $2,500 flat fee. Mr. Isner admitted to delays and dormancies in the case, but denied any intentional evasion of Mr. Kesner, asserting that he conducted "regular" meetings and phone calls with him from May 2021 until the time of the disciplinary complaint. Before the HPS, Mr. Isner apologized to Mr. Kesner and offered him a full refund but noted that he also represented Mr. Kesner in a criminal matter which was favorably resolved at no charge.

Although he now challenges Count 6 in its entirety, Mr. Isner admitted to violations of Rule 1.3 and Rule 3.2 for general neglect of Mr. Kesner's case in his answer to the Statement of Charges. Although he disputes the alleged lack of communication with Mr. Kesner, the HPS found Mr. Isner violated Rules 1.4(a)(3) and 1.4(a)(4) by failing to respond to Mr. Kesner's inquiries and keep him informed.

*Count 7—Linda Taylor*

In her 2024 complaint, Ms. Taylor alleged that in September 2023 she paid Mr. Isner a $4,000 retainer for assistance in obtaining temporary custody of her granddaughters. After weeks of trying without success to reach Mr. Isner, he told her the case "was not what he thought" and would refund her retainer on December 1, 2023. After he failed to issue a refund, Ms. Taylor filed a complaint with ODC; Mr. Isner then sent her a full refund along with his response to her complaint.

11

Mr. Isner responded that he believed Ms. Taylor was seeking his assistance with an abuse and neglect proceeding, but after much difficulty learned it was a guardianship. He allegedly conducted legal research to determine if Ms. Taylor had standing to intervene in a guardianship case and claimed not to have any communication from her until November 2023 when she sought a refund. Although he agreed to only a partial refund because of time expended in the "research and strategy phase[,]" Mr. Isner admitted he failed to timely issue a refund and therefore violated Rule 1.16(d). Mr. Isner also admitted violating Rules 1.4(a)(3) and 1.4(a)(4) by failing to respond to Ms. Taylor's inquiries and keep her informed.

Based on these twenty-five violations of the Rules of Professional Conduct, the HPS determined that Mr. Isner's misconduct violated duties to his clients, the public, the legal system, and the profession. *See* W. Va. R. Law. Disciplinary Proc. 3.16; Syl. Pt. 4, *Off. of Law. Disciplinary Couns. v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998) (requiring consideration of "'(1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors[,]'" in fashioning a sanction).

Because of his prior discipline for the same conduct, the HPS found Mr. Isner acted "knowingly" and "with conscious awareness" of the consequences of his conduct,

causing "delay[] [and] frustration," and resulting in "a sense of lost justice, and loss of trust in lawyers and the legal system." The HPS found his prior disciplinary offenses and pattern of misconduct aggravating, but his cooperative attitude and remorse mitigating.

The HPS recommended a one-year suspension and refund of $2,500 to Mr. Kesner, as well as payment of costs for these proceedings. Citing his admitted lack of malpractice insurance, the HPS emphasized that Mr. Isner's former clients "have no other recourse but the assurance that [Mr. Isner] will not be able to use his law license to inflict harm upon future clients." Mr. Isner objected to the HPS's recommendations, and the matter was placed on the Court's argument docket for our review.

## II.

### STANDARD OF REVIEW

The Court gives "substantial deference" to the HPS's findings of fact, but those findings must be "supported by reliable, probative, and substantial evidence on the whole record." Syl. Pt. 3, in part, *Comm. On Legal Ethics of W. Va. v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994). And while the Court gives the HPS's recommendation "respectful consideration," we maintain plenary review as the final arbiter of lawyer discipline. *Id.*; *see* Syl. Pt. 3, *Comm. On Ethics of W. Va. State Bar v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984) ("This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law.").

13

**III.**

**DISCUSSION**

Mr. Isner challenges the HPS's findings as to Counts 2 and 6 and its ultimate discipline. He argues that ODC failed to present clear and convincing evidence that he violated duties to Mr. Kramer and Mr. Kesner and that the HPS's recommended suspension exceeds sanctions imposed for comparable misconduct. Because Mr. Isner admitted the remaining violations and our review reveals that they are well-founded, with the exception of one violation contained in Count 5, *see* text *infra*, we accept the HPS's findings as to those violations and limit our analysis to Counts 2 and 6.

*A. Counts 2 and 6—the Kramer and Kesner matters*

We begin with Mr. Isner's challenge to the HPS's findings of fact as to Counts 2 and 6 involving Mr. Kramer and Mr. Kesner, respectively.[18] Mr. Isner argues that ODC failed to establish the rule violations alleged in these Counts because it offered only uncorroborated testimony from the complainants. Mr. Isner attacks their credibility, arguing that Mr. Kramer and Mr. Kesner are laypersons without the knowledge to

---

[18] As noted above and memorialized in the HPS's recommendation, Mr. Isner admitted violations of Rules 1.3 and 3.2 in his answer to the Statement of Charges with respect to Mr. Kesner, denying only the communication violations. He does not acknowledge or address those admissions.

understand litigation practicalities and strategies[19] and who, despite his alleged neglect of their cases and inquiries, continued to retain him for various matters over the years.

As Mr. Isner correctly observes, our Rules require ODC to prove allegations of misconduct by clear and convincing evidence. W. Va. Rules of Law. Disciplinary Proc. 3.7; Syl. Pt. 1, in part, *Law. Disciplinary Bd. v. McGraw*, 194 W.Va. 788, 461 S.E.2d 850 (1995). However, the record reflects that Mr. Isner failed to file discovery in accordance with the scheduling order issued by the HPS. As a result, the HPS granted ODC's motion to exclude all witnesses, exhibits, or mitigating evidence offered by Mr. Isner at his evidentiary hearing—a motion Mr. Isner did not oppose. While he was permitted to testify on his own behalf and cross-examine the complainants, Mr. Isner was not permitted to offer additional witnesses or introduce evidence to contradict the complainants' testimony.

Although Mr. Isner attacks the adequacy of ODC's evidence, this self-inflicted evidentiary prohibition leaves him ill-equipped to rebut ODC's evidence or corroborate his denials of misconduct. Mr. Isner testified that he was adequately responsive to Mr. Kramer and Mr. Kesner, that their expectations were unreasonable, and that their litigation suffered not from a lack of diligence but from inevitabilities and factors beyond his control. Yet he offered nothing but his own self-serving denials, uncorroborated by any

---

[19] For example, regarding his alleged lack of diligence and failure to expedite Mr. Kesner's litigation matters, Mr. Isner proposed that the HPS dispense with those charges because they constituted nothing more than Mr. Kesner's "suppositions as a layperson"— despite having admitted those violations in his answer.

documentation of calls, emails, or the work performed in Mr. Kramer's and Mr. Kesner's cases to contradict their claims. This lack of corroboration rendered the complainants' allegations a pure credibility issue that the HPS resolved in the complainants' favor. The Court has often reminded that the HPS "is in a better position than this Court to resolve the factual disputes which may arise in a case[]" because it "hears the testimony of the witnesses firsthand and, being much closer to the pulse of the hearing, is much better situated to resolve such issues as credibility." *McCorkle*, 192 W. Va. at 290, 452 S.E.2d at 381 (footnote omitted); *Law. Disciplinary Bd. v. Harris,* 251 W. Va. 376, 380, 914 S.E.2d 249, 253 (2025) (deferring to HPS's dismissal of charges due to complainant's lack of credibility); *Law. Disciplinary Bd. v. Curnutte*, 251 W. Va. 839, 847, 916 S.E.2d 681, 689 (2025) ("The HPS resolved that credibility issue, and we defer to its resolution."); *Law. Disciplinary Bd. v. Scotchel*, 234 W. Va. 627, 645, 768 S.E.2d 730, 748 (2014) ("The HPS had the opportunity to observe Mr. Scotchel's testimony and found that much of his testimony lacked credibility. The HPS was also able to hear and observe the testimony of several witnesses which the HPS found to be credible.").

Mr. Isner's arguments and proposed findings also confirm that his objection to the HPS's findings is grounded in credibility determinations. For example, with respect to Mr. Kramer's complaints, Mr. Isner argues the HPS should have rejected those rule violations and found that "[i]t is hard to find Mr. Kramer *credible* as he hired [Isner] on at least two additional occasions spanning a period of 6-7 years. If [Mr. Isner's] communication was a [sic] bad as he claimed, it seems unlikely he would have hired [Mr.

16

Isner] three separate times." (Emphasis added). He further argues that the HPS should have found his own testimony "regarding the reasonableness of Mr. Kramer's demands as it relates to communication to be *credible*[]" and that "[w]ith no corroborating evidence and only the testimony of the Kramers to support this claim," no violation of Rule 1.3 or 1.4 was established. (Emphasis added).[20] Likewise, with respect to Mr. Kesner's complaints, Mr. Isner argues the HPS should have found an absence of clear and convincing evidence that he "fail[ed] to keep Mr. Kesner informed in light of the *conflicting* testimony between Mr. Kesner and [Mr. Isner] and the overall lack of *credibility* of Mr. Kesner's claims[.]" (Emphasis added).

Due to his own neglect, Mr. Isner was foreclosed from offering any evidence to contradict the complainants' thematically consistent testimony about his refusal to return phone calls, provide timely information, attend scheduled meetings, or timely perform promised work—even across years of representation in various matters. Contrary to Mr. Isner's arguments, it was his own testimony that lacked corroboration while the complainants' testimony was corroborated *across* the various counts. Client after client shared virtually identical complaints about Mr. Isner's refusal to return phone calls, keep them informed about their cases, and timely and properly perform promised work, most of

---

[20] Similarly, with respect to the missing photographs and papers, Mr. Isner argues that the HPS should have found that "[i]f the photo album was not returned . . . it seems illogical to *believe* that Mr. Kramer would have sought [Mr. Isner's] representation with two subsequent matters. Finally, [Mr. Isner] would have no *motive* to keep photographs of Mr. Kramer's family." (Emphasis added).

which Mr. Isner admitted in either his answer or proposed findings. We therefore adopt the HPS's findings and associated Rule violations as to Counts 2 and 6.

### B. Count 5—the Rule 1.3 violation

Despite Mr. Isner's admission to each of the rule violations alleged in this Count, we pause to more closely consider Rule 1.3. Mr. Isner admitted three rule violations resulting from his failure to timely prepare family court orders in the case, including a violation of Rule 1.3's diligence requirement. Before this Court, he argues only that there was no harm in his failure to do so, as part of the required *Jordan* analysis. However, as we have recently observed with respect to judicial disciplinary matters, "blind acceptance of . . . admissions or stipulations may undermine the integrity and consistency of the disciplinary process where they are not well-founded." *In re Boso*, 252 W. Va. 224, ___, 921 S.E.2d 679, 686 (2025).

Rule 1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." We recently emphasized that this obligation runs to a lawyer's *client*, as stated in the Rule, and limited its application in that regard. *See Harris*, 251 W. Va. at 394, 914 S.E.2d at 267 (finding no Rule 1.3 violation where lawyer acted as trustee because the rule "describe[s] the duties of diligence and expedition of litigation a lawyer owes to his *client*." (footnote omitted)).

18

As indicated above, Mr. Cox was not Mr. Isner's client, but rather was the opposing party in divorce proceedings who complained of Mr. Isner's untimely submission of orders in the case. While Mr. Isner's admitted misconduct violates obligations to the tribunal and to the administration of justice under Rules 3.4(c) and 8.4(d), ODC presented no evidence that Mr. Isner's client objected to or was harmed by this conduct. Mr. Isner's client ostensibly made no formal complaint, nor did she testify in the proceedings below; in fact, Mr. Cox himself did not testify. During oral argument, ODC urged this Court to "presume" commensurate harm to a client where an opposing party complains of delay. But the "presumption" of harm to a lawyer's client based solely on the complaints of an opposing party neither logically follows nor holds ODC to its burden of proof. We therefore reject the Rule 1.3 violation found by the HPS as to Count 5.

### C.     Sanction

In his opposition to the HPS's recommended one-year suspension, Mr. Isner argues primarily that his misconduct was not "knowing," as found by the HPS, but merely negligent. He further argues that his misconduct caused little to no harm on the whole, and that a one-year suspension exceeds the discipline rendered in similar cases. More generally, Mr. Isner insists these violations are the residue of the "practice management shortcomings, isolated delays, and communication lapses" that the discipline arising from his 2022 charges—and particularly his supervised practice—has already addressed. He contends

19

that a one-year suspension will derail the significant progress and improvements he has made since his supervised practice began in August 2023.[21]

First, we reject Mr. Isner's characterization of his misconduct as simple negligence. His disciplinary history and the numerous complaints in this matter reflect an unrelenting refusal to communicate with his clients and diligently perform work, even after receiving multiple ethics complaints for this behavior for which he was required to answer before disciplinary authorities and this Court. This same type of misconduct dates back as far as 2017 and, contrary to Mr. Isner's assertions, did not abruptly cease after he began his supervised practice. Ms. Taylor's complaints about Mr. Isner's lack of responsiveness and failure to promptly refund her retainer occurred *during* his supervised practice. And while the remainder occurred before his supervised practice began in August 2023, most of the misconduct occurred while his most recent 2022 disciplinary complaint for the same misconduct was pending. We agree with the HPS's conclusion that Mr. Isner's refusal to improve his communication and diligence even in the face of disciplinary action for those same failures demonstrates "conscious awareness" of the ramifications and therefore a knowing violation of those rules.

We also conclude that a one-year suspension is appropriate for the twenty-four violations in this case and consistent with discipline rendered in similar cases. In

---

[21] Mr. Isner claims that since his prior disciplinary matter he has met regularly with his supervisor, hired a consultant to review his practice, narrowed the scope of his practice, billed more regularly, and better controlled his caseload.

*Lawyer Disciplinary Board v. Morgan*, 228 W. Va. 114, 717 S.E.2d 898 (2011), the Court suspended an attorney for one year for similar misconduct resulting in ten rule violations and affecting four different clients. Like Mr. Isner, Mr. Morgan was previously admonished for failure to communicate with clients and demonstrated an ongoing pattern and practice of that misconduct, warranting a one-year suspension. *Id*. at 120, 717 S.E.2d at 904. More recently, in *Lawyer Disciplinary Board v. Thorn*, 236 W.Va. 681, 783 S.E.2d 321 (2016), we suspended a lawyer for one year for violations primarily resulting from a lack of diligence, competence, communication, and improper fee handling. These violations affected eleven separate clients and, while the resulting forty-three violations exceed that of Mr. Isner's, we found that Mr. Thorn's misconduct was largely negligent and that his depression was a significant mitigating factor. *Id*. at 697-98, 783 S.E.2d at 337-38.

We further find the cases cited by Mr. Isner—*Lawyer Disciplinary Board v. Curnutte* and *Lawyer Disciplinary Board v. Davis,* No. 20-0871, 2022 WL 421119 (W. Va. Feb. 11, 2022) (memorandum decision)—too dissimilar to be persuasive. Mr. Isner argues that *Curnutte* involved similar violations of Rules 1.3, 1.4, 3.2, and 8.4 affecting four clients, yet we suspended Mr. Curnutte for only six months despite a previous ninety-day suspension. Likewise, he argues that *Davis* involved an experienced attorney with a prior suspension, knowing violations, a persistent failure to cooperate with ODC, and no mitigating factors, yet we also suspended him for only six months.

However, *Curnutte* involved only two affected clients[22] and one complaint arising from misconduct as a mediator—fewer than the six affected individuals here. *Id.* at 843-45, 916 S.E.2d at 685-87. And while Mr. Curnutte had previously been suspended, it was not for the same type of professional neglect involved in that matter, thereby lacking the pattern and practice Mr. Isner's misconduct demonstrates. *Id.* at 851-52, 916 S.E.2d at 693-94. [23] *Davis* is an even less persuasive comparator because it involved only six rule violations arising out of one client matter. 2022 WL 421119, at *1. Although Mr. Davis's "considerable history of virtually identical professional shortcomings[]" more closely resembles Mr. Isner's, his misconduct in that case had a substantially more limited impact than Mr. Isner's. *Id.* at *7.

In that regard, we reject Mr. Isner's position that, aside from Ms. Timbrook's unperfected appeal, the "actual or potential injury" to the complainants was negligible. *Jordan*, 204 W. Va. at 495, 513 S.E.2d at 722, Syl. Pt. 4. The complainants expressed unremitting concern and frustration throughout their litigation due to the lack of information and progress, exacerbated by their inability to reach or speak with Mr. Isner

---

[22] One of the additional counts resulted in only a violation of Rule 8.1(b) for Mr. Curnutte's failure to respond to the complaint, rather than any client-related misconduct. *Id.* at 845, 916 S.E.2d at 687.

[23] Mr. Isner's choice to direct us to the *Curnutte* matter is curious given that Mr. Curnutte was disciplined, in part, for his failure to memorialize the settlement resulting from the mediation involving Mr. Kramer, as discussed above. Unhelpful to Mr. Isner's cause, our opinion disciplining Mr. Curnutte states that he only agreed to prepare the agreement in the first instance because he was "'pretty sure Mr. Isner would not carry through with preparing [it].'" *Curnutte*, 251 W. Va. at 849, 916 S.E.2d at 691.

about those concerns. Nearly all the complainants' cases involved domestic or child custody issues that present significant emotional turmoil under the best of circumstances. To be neglected by the lawyer hired to guide and protect a client's interests is profoundly harmful to the trust placed in not only a specific lawyer, but the legal profession and system as a whole. In addition to the demonstrable damage to Ms. Timbrook's case, the harm to these clients weighs heavily in our consideration of the appropriate sanction.

Finally, while we agree with the HPS that Mr. Isner was remorseful and generally cooperative in the underlying proceedings, his sustained pattern of misconduct for nearly a decade, along with his disciplinary history, necessitate suspension. We commend Mr. Isner for his interest in continuing his practice management improvements, however, our prior supervised practice requirement did not grant him immunity from discipline for complaints not yet adjudicated.[24] Even if Mr. Isner had comprehensively addressed the practice management shortcomings to which he attributes the underlying complaints, lawyer discipline is not merely corrective:

> In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

---

[24] This reference to unadjudicated complaints, however, pertains only to the charges presently before the Court. We expressly decline ODC's suggestion that we may consider pending charges that have not yet been presented to the HPS.

23

Syl. Pt. 3*, Comm. on Legal Ethics of W. Va. State Bar v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).

## IV.

## CONCLUSION

For the foregoing reasons, we impose the following sanctions: 1) Mr. Isner is hereby suspended from the practice of law for one year and is directed to abide by the mandates imposed pursuant to Rule 3.28 of the Rules of Lawyer Disciplinary Procedure; 2) Mr. Isner must issue a refund to Ronald Kesner in the amount of $2,500.00; and 3) prior to being reinstated to the practice of law, Mr. Isner must reimburse the costs of these proceedings to the Lawyer Disciplinary Board pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

Law license suspended and other sanctions imposed.